CLIFF HOUSE NURSING HOME, INC. *vs.* RATE SETTING
COMMISSION & another.[1]

Suffolk.  March 14, 1983. — July 5, 1983.

Present: GRANT, CUTTER, & KASS, JJ.

*Administrative Law*, Regulations, Rate setting, Agency, Judicial review.
*Nursing Home.  Value.*

With respect to the real estate component of a health care provider's oper-
ating expenses to be used by the Rate Setting Commission for purposes
of determining proper reimbursement of costs to the provider, this
court, in the absence of adequate support in the record for the Com-
mission's decision to disregard the actual rent paid by the provider and
substitute for it the fixed costs of its lessor, remanded this case to the
Commission for a determination of the reasonable and necessary ex-
penses of both the provider and its lessor allocable to the real estate
upon and in which the provider was operating a nursing home.
[303-307]

CIVIL ACTION commenced in the Superior Court Depart-
ment on August 28, 1980.

The case was heard by *Forte*, J., a District Court judge
sitting under statutory authority.

*John O. Mirick* for the plaintiff.

*Ellen L. Janos*, Assistant Attorney General, for Rate Set-
ting Commission.

KASS, J.  At the heart of these proceedings, which began
in 1974, is the question whether, on the facts presented, the
Rate Setting Commission (RSC) for purposes of establishing
the rate of payment to Cliff House Nursing Home, Inc.
(Cliff House), as a provider of health care services, may dis-
regard the rent paid by Cliff House and may substitute the
fixed costs of the lessor (real estate taxes, interest, and build-
ing depreciation).

---

[1] Division of Hearings Officers.

Earlier, in *Cliff House Nursing Home, Inc.* v. *Rate Setting Commn.*, 378 Mass. 189, 190 (1979), it had been determined that the Division of Hearings Officers (DHO) had authority under G. L. c. 6A, § 36, to require the RSC to compare the rent Cliff House paid with the rent paid by the Governor Winthrop Nursing Home, another nursing home in Winthrop and one of similar size.

By letter dated October 10, 1979, the RSC notified Cliff House that it had concluded Cliff House and the Governor Winthrop were not comparable nursing homes, an action from which Cliff House once again appealed to DHO. The DHO affirmed the RSC's finding of noncomparability and established $51,097, the aggregate of the lessor's stipulated real estate taxes, interest, and building depreciation, as the real estate component of Cliff House's expenses to be used in rate setting. Cliff House petitioned for judicial review as provided in G. L. c. 6A, § 36, a review which by the last paragraph of § 36 is governed by G. L. c. 30A, § 14. A judge of a District Court sitting in the Superior Court by designation affirmed the decision of the RSC, and Cliff House has appealed from the resulting judgment.

It is useful at this point to describe the legislative and regulatory arena in which this protracted contest has been played. Under G. L. c. § 6A, § 32, as inserted by St. 1973, c. 1229, § 2,[2] the RSC had specific and general authority to make regulations which govern the RSC's duty to set "fair, reasonable and adequate" rates to be paid by governmental units for health care services. See also G. L. c. 6A, § 36. For the year in question, 1972,[3] the governing regulation promulgated by the RSC was commission regulation no. 72-1, § 7(h) (1972), the full text of which appears in the

[2] At the time of the fiscal period in dispute, the governing laws were G. L. c. 7, §§ 30L and 30O. General Laws c. 6A, §§ 32 and 36, superseded those provisions without substantive change material to this case.

[3] Other years raised the same dispute, but the rate for 1972 is the pilot case, and the parties have stipulated that the method finally applied as to 1972 will be applied to the other years in dispute.

margin.[4]  In computing the rate base of a provider, in this case a nursing home, the regulation permits the RSC to disregard rental and leasehold expenses if: (1) they are not comparable to other properties in the area; (2) those expenses exceed what the provider would have been allowed had he owned the facilities; (3) there is insufficient basis for comparison; or (4) the lessor and the provider are related.

Prior to 1970, the ninety-bed nursing home in Winthrop which is the subject of this case had been operated for seven years under the name Mount Convalescent Home. The owner of the real estate and of the over-all nursing home enterprise during that period was one Morris Spector, who was also the administrator. Cliff House was organized to assume operation of the facility and did so in 1970. The successor administrator was Melvin Silverman, who had been an assistant to Spector during the latter's ownership. Silverman's wife, Estelle, who had also been employed by Spector, was president of Cliff House. The new operating corporation, i.e., Cliff House, bought the equipment, and leased the land and building from Spector. In 1973, Cliff House, exercising an option, bought the facility (i.e., land, building and real estate fixtures, but not equipment) for $900,000. It appears not to be contested that, by extrapolation from that purchase price, Cliff House would have been allowed a real estate expense of $107,236 had Cliff House

---

[4] "Rental and leasehold expenses shall be included as a reasonable operating cost to the extent of prevailing rentals for comparable properties in the area as determined by the Commission and provided the expenses do not exceed the amount which would be allowable if the provider owned the facilities and were taking the allowable depreciation provided in Section 5 (g) of this regulation. In the event that the rent or lease payment is made to a related person (see paragraph [5] above), or in the event that, in the opinion of the Commission there is an insufficient basis for comparing the rent or lease payment, reasonable and necessary expenses of both the provider and the lessor (including interest, depreciation, real estate taxes, insurance, and other reasonable and necessary expenses) shall be substituted for the rental or lease payment." A successor provision which deals with the same subject now appears in 114.2 Code Mass. Regs. § 2.06(16) (1981). It is a somewhat more sophisticated and improved model.

owned the facility in 1972. That, of course, would have been double the $51,097 real estate component allowed by the RSC. Cliff House reported an actual arm's length rent for 1972 of $113,171.

By urging that the RSC may not ignore the actual rent Cliff House was obliged to pay in 1972 under a lease found to have been made at arm's length, Cliff House necessarily challenges the validity of § 7(h) of the governing regulation, which expressly permits the RSC to do just that. It is a challenge fated to fail. Courts accord to regulations, including rate regulations, the same deference they extend to acts of the Legislature. *Palm Manor Nursing Home, Inc.* v. *Rate Setting Commn.*, 359 Mass. 652, 655-656 (1971). *Massachusetts State Pharmaceutical Assn.* v. *Rate Setting Commn.*, 387 Mass. 122, 127 (1982). In consequence, a regulation is valid if it has a reasonable relation to the goal advanced by the statute, *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 776 (1980), and regulations are entitled to particularly great weight where the statute itself, G. L. c. 6A, § 32, "vests broad powers in the agency to fill in the details of the legislative scheme." *Affiliated Hosps. Center, Inc.* v. *Rate Setting Commn.*, 7 Mass. App. Ct. 563, 579 (1979), quoting from *Amherst-Pelham Regional Sch. Comm.* v. *Department of Educ.*, 376 Mass. 480, 492 (1978).

The Massachusetts reimbursement system is designed to mesh with "the principles of reimbursement . . . in effect from time to time under Titles XVIII and XIX of the Social Security Act."[5] G. L. c. 6A, § 32. Both the Federal (42 U.S.C. § 1395f[b][1][A] [1976]) and State (G. L. c. 6A, § 32) systems speak in terms of compensation for reasonable, rather than actual, expenses. Medical providers are not to be reimbursed for expenses improvidently incurred or simple inefficiency in operation. See Weiner, "Reasonable Cost" Reimbursement for Inpatient Hospital Services Under

---

[5] Title XVIII is generally known as Medicare and Title XIX is generally known as Medicaid.

Medicare and Medicaid: The Emergence of Public Control, 3 Am. J.L. & Med. 1, 37 (1977). In the instant case, for example, the arm's-length rent could represent a distortion of market rent because the rent, however fierce the bargaining which led to its establishment, may contain a component related to the acquisition of the nursing home business from Spector by the Silvermans. See as illustrations that reasonable costs are distinguishable from and may be less than actual costs: *Cabot Nursing Home, Inc.* v. *Rate Setting Commn.*, 359 Mass. 686, 688-691 (1971); *Murphy Nursing Home, Inc.* v. *Rate Setting Commn.*, 364 Mass. 454, 462, 467-468 (1973); *Massachusetts Gen. Hosp.* v. *Weiner*, 569 F.2d 1156, 1159 (1st Cir. 1978). See also *Johnson's Professional Nursing Home* v. *Weinberger*, 490 F.2d 841, 842-845 (5th Cir. 1974), and *Flathead Health Center* v. *County of Flathead*, 183 Mont. 211, 212-215 (1979), which dwell on the Federal criteria. Regulation no. 72-1, § 7(h), realizes in a rational manner the statutory purpose of imposing discipline on health providers by limiting reimbursement to costs which are reasonable in a market sense and not simply to out-of-pocket costs.

Following the judgment of remand affirmed in *Cliff House Nursing Home, Inc.* v. *Rate Setting Commn.*, 378 Mass. at 190, it became the RSC's assignment to compare the rent claimed by Cliff House with the rent, $127,800, paid by the relatively proximate Governor Winthrop nursing home in 1972. The RSC found the two facilities were not comparable and the rent paid by the Governor Winthrop, therefore, not useful as a guide. If approached by customary valuation criteria, the conclusion that the two nursing homes were not comparable was less than inevitable. They were located in the same town, drew patients from the same area, offered the same levels of care, received referrals from the same hospitals, shared the same medical director, dietician, and occupational therapist, and were subject to the scrutiny of the same utilization review committee. As earlier noted, the bed capacity was almost precisely the same: Governor Winthrop had eighty-seven beds

and Cliff House had ninety. On the surface, the two facilities looked much alike, that is, had a masonry veneer and were built within three years of one another. Their structures were different from one another. Governor Winthrop, built in 1966, was of steel and masonry construction classified as "protected ordinary" under standards of the National Fire Protection Association, while Cliff House was built of "protected wood frame" construction. To a hypothetical willing buyer or lessee, their capacities to earn income from a nursing home business were substantially the same.

In the findings of the RSC and, on administrative review, of the DHO, there was a definitive distinction made between the two: the rent arrangement at Cliff House was at arm's length; at Governor Winthrop it was not (there was an identity of interest between the property owner and the operator). Indeed, the DHO hearing officer observed that he would have found the two nursing homes to be comparable but for the determination that the Governor Winthrop "was not truly a rental property, thus negating any comparison of the [h]omes under Reg. 72-1, § 7(h)." That the rent arrangement at the Governor Winthrop was not at arm's length was a finding supported by substantial evidence, *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 465-466 (1981), and a proper basis for refusing to look to that rent as one prevailing for a comparable property in the area. See *Epstein* v. *Boston Housing Authy.,* 317 Mass. 297, 300-301 (1944); 5 Nichols, Eminent Domain § 21.2, at 21-8 (rev. 3d ed. 1981).

Rejection of the rent paid by the Governor Winthrop disposed of the precise term of the remand to the RSC from the first round of judicial review, but it did not dispose of the core of the case: What real estate component should Cliff House be allowed in its operating expenses? As to that question, the response of the RSC and DHO was $51,097, the aggregate of the lessor's expenses for real estate taxes, interest and depreciation. That figure is grossly disparate from the amount which Cliff House would have been al-

lowed, $107,236, had it acquired the nursing home property in 1972 for the price at which, in fact, it was acquired in 1973, and the amount, $90,659, which the Governor Winthrop was allowed by RSC as rent for 1972. Although the Governor Winthrop and Cliff House were not comparable so far as their actual rent arrangements were concerned, they were, as we have observed, otherwise comparable, and surely the real estate expenses found by the RSC to be fair and reasonable for the Governor Winthrop should have furnished some useful guidance to what was fair and reasonable for Cliff House.

In view of that disparity, we may fairly inquire whether the RSC has correctly applied regulation no. 72-1, § 7(h). To be sure, courts accord deference to an agency's interpretation of its own rules, but the "principle is one of deference, not abdication." *Finkelstein* v. *Board of Registration in Optometry*, 370 Mass. 476, 478 (1976), and cases cited. Cf. *Utility Wkrs. of America, Local 466* v. *Labor Relations Commn.*, 389 Mass. 500, 504 (1983).

Once the RSC decided, for the reasons we have discussed, to disregard the actual rent paid by Cliff House to Spector, its next task under § 7(h) was to determine the "reasonable and necessary expenses of both the provider and the lessor (including interest, depreciation, real estate taxes, insurance, and other reasonable and necessary expenses)." The RSC, in arriving at a rental and leasehold expense figure, itemized only costs of the lessor, Spector, and none of the provider, Cliff House. Although Cliff House introduced no evidence before the RSC or DHO as to what subsidiary items were subsumed in its claimed real estate expenses, we think Cliff House met its burden in this regard by offering evidence of what the RSC had allowed the Governor Winthrop and would have allowed Cliff House had it owned the property. Cf. *World Wide Realty* v. *Boston Rent Control Admr.*, 7 Mass. App. Ct. 327, 329 (1979). At the least, there would be a profit factor in the lease which would be an expense of the provider. Cf. *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. 686, 702-

706 (1971); *Niles* v. *Boston Rent Control Admr.*, 6 Mass. App. Ct. 135, 146 (1978). Contrast *Zussman* v. *Rent Control Bd. of Brookline*, 371 Mass. 632, 640 (1976). That factor would be high or low depending on the lessor's historic acquisition costs and financing expense, both of which in this case appear to have been favorably low to the lessor. One would expect, however, that the lessor would set his rent on the basis of the prevailing market rather than on his historic costs. As to these questions, we suppose the RSC may have some expert knowledge, but from what appears in the record, neither profit nor other expenses for which the provider may have been responsible under the lease (e.g., insurance and repairs) were considered. There is no other way to explain the yawning gap between what the RSC allowed Cliff House and what it allowed the Governor Winthrop and appeared prepared to allow Cliff House as owner rather than lessee of the property.

It thus becomes necessary to reintroduce this already protracted case into the administrative machinery for a determination of appropriate provider costs as well as lessor costs fairly and reasonably allocable to the real estate upon and in which Cliff House operates. In assessing the validity of those costs, the RSC may be guided in part by the real estate expenses allowed to owner occupied or affiliated nursing homes of similar size, age and amenities, and operating in similar markets.

The judgment is reversed. A new judgment shall be entered remanding the case to the Rate Setting Commission for further proceedings consistent with this opinion.

*So ordered.*