ANNE MARIE SMITH vs. COMMISSIONER OF MENTAL
RETARDATION & others.[1]

No. 88-P-1197.

Hampden. February 12, 1990. - June 1, 1990.

Present: ARMSTRONG, CUTTER, & KASS, JJ.

Further appellate review granted, 408 Mass. 1101 (1990).

Public Employment, Provisional employee, Termination. Administrative
Law, Regulations. Due Process of Law, Termination of employment,
Hearing.

Personnel disputes within the Department of Mental Retardation are not
governed by the regulations set forth at 104 Code Mass. Regs. § 24.00
(1986), which are directed to the interests of clients served by that de-
partment. [632-634]
A provisional employee of the Department of Mental Retardation was con-
stitutionally entitled to notice and a trial-type hearing to challenge a
demotion in circumstances where the action of the agency put at stake
the employee's reputation and good character by a charge of dishonesty
and where it was likely that the stigmatizing information would be dis-
seminated. [634-637]

CIVIL ACTION commenced in the Superior Court Depart-
ment on November 17, 1987.

The case was heard by Mel L. Greenberg, J., on a motion
for summary judgment.

Stephen R. Kaplan for the plaintiff.

Richard M. Brunell, Assistant Attorney General, for the
defendants.

KASS, J. As a provisional employee of the Commonwealth,
Anne Marie Smith would not ordinarily have been entitled to

[1]Donald J. Fletcher, individually, and in his capacity as superintendant
of Monson Developmental Center; Stephen Dykstra, in his capacity as
director of individual service planning and coordination at Monson
Developmental Center; and William Teece, in his capacity as an
investigator within the office of internal affairs of the Department of
Mental Retardation.

a trial-type hearing to challenge her demotion from Supervisor of Individual Service Planning and Coordination to Day Care Services Specialist at the Monson Developmental Center ("Monson").[2] See *Rafferty* v. *Commissioner of Pub. Welfare*, 20 Mass. App. Ct. 718, 723-725 (1985). In disciplining Smith, however, the superintendent of Monson, Donald J. Fletcher, cited as cause acts of intentional fabrication and dishonesty by her. The nature of the charge made by Fletcher raises the question whether placing a stigma of dishonest conduct upon a State employee in a manner likely to be disseminated to potential employers induces a requirement of a hearing at which the employee may confront and, with the assistance of counsel, examine her accusers. We think Smith is entitled to such a hearing, and we reverse the judgment.

Judgment was entered below after allowance of the defendants' motion for summary judgment. The motion, when filed, was directed against a first amended complaint, but appears to have been considered in the light of a second amended complaint. See note 6, *infra*.

On September 11, 1987, Smith had an apparently unpleasant encounter with William Gauthier, the president of Parents and Friends of Monson Developmental Center, Inc. ("Parents and Friends"), a support group for Monson and its residents.[3] She understood Gauthier to say that he was going to have her fired. The next day she sent a letter to Gauthier memorializing their conversation and recounting conversations with others which led her to conclude that persons connected with Parents and Friends were engaged in a campaign against her. Smith expressed particular concern about what her State Representative, Paul E. Caron (11th District, Hampden), had told her concerning a conversation of his with Gauthier about Smith. Things were said, Smith wrote,

---

[2] The Monson Developmental Center is a residential facility operated by the Department of Mental Retardation in Palmer, Massachusetts. For the organization of the department, see G. L. c. 19B, as inserted by St. 1986, c. 599, § 9.

[3] Parents and Friends served as guardian for over ninety Monson residents.

that could not have been said unless confidential material from her personnel file had been leaked. Specifically, Smith referred to "items . . . pertaining to [her] recent illness and hospitalization" contained in a "confidential investigative report."

On the same day that she wrote to Gauthier, September 12, 1987, Smith also fired off a letter to the Commissioner of Mental Retardation, Mary A. McCarthy. The communication to Commissioner McCarthy restated Smith's apprehension that confidential material from her personnel file had been unlawfully disseminated. "The evidence for a [G. L.] c. 66A trespass appears strong," she wrote. Her letter continued: "Since there is a possibility that Mr. Fletcher may not have assured proper safeguards for the files, I have decided not to ask him to investigate himself and instead direct my complaint to you."

Nothing came of the request that the Commissioner herself look into whether material from Smith's files had been improperly leaked. Instead she heard within the week from Fletcher that he was "hereby taking full responsibility for thoroughly investigating this matter." Fletcher assigned the investigation to William Teece, an investigator in the office of internal affairs of the Department of Mental Retardation. There followed memoranda and counter memoranda having to do with such things as who would appear before whom and whether accompanied by counsel. A further effort by Smith to persuade the Commissioner of Mental Retardation that allowing Fletcher to direct the investigation was to let the fox patrol the henhouse was unavailing. There was also an excursion to Superior Court which centered on whether Smith might be attended by counsel at her interview by Teece.

On December 29, 1987, Smith appeared before Teece. That appearance was subject to a protest, lodged in letter form by Smith's lawyer, Mr. Stephen R. Kaplan, that any investigation should follow the relatively elaborate procedures required by 104 Code Mass. Regs. § 24.00 (1986). Those procedures involve steps which escalate from informal

inquiry to a trial-type hearing before a hearing officer. By way of response to Mr. Kaplan's letter, counsel for the department, Ms. Patricia A. Oney, said the subject of the investigation was Smith's letter to Gauthier but that, "as in all cases where the employee makes a complaint, she is a potential subject of the investigation to the extent that her allegations are false." Teece made a report on January 7, 1988. He had interviewed Gauthier, Leon Burdick, the treasurer of Parents and Friends, Ms. Oney, Fletcher, and Thomas Mineo, the director of personnel at Monson. Remarkably, Teece did not meet or speak with Representative Caron, whom Smith had identified as the principal source of her information. Teece's January 7th memorandum comes to two principal conclusions: (1) Smith's charge "of distribution of information from her personnel file is unfounded" and (2) a finding was not warranted that Smith had intentionally made false allegations against Gauthier and Parents and Friends.

Some six weeks later, under date February 22, 1988, Teece republished, in revised and fleshed out form, his report on the Smith-Gauthier matter. The later report sets forth that the adverse information disseminated by Gauthier related to a triangular woman-man-woman quarrel which occurred on June 25, 1987, and as to which Smith had acted out her side of the triangle in unacceptably public fashion on the Monson campus.[4] Teece writes that the incident had

---

[4]Teece's report also indicates that there was no basis to Smith's complaint that some official at Monson had improperly divulged her confidential medical data. He notes that "Representative Caron stated that Mr. Gauthier never provided him with any information regarding Ms. Smith's illness and hospitalization" and reports that there was no confidential information in her personnel file that mentioned any illness or hospitalization. The "illness or hospitalization" component of Smith's complaint, nevertheless, remained something of a loose thread for Teece. The plaintiff in her reply brief suggests that she was justified in assuming that a letter she wrote to Fletcher would have become part of her file. The letter, written July 2, 1987, apparently asked for a retraction of the reprimand Smith received following the June 25, 1987, incident because it was due to an illness resulting in hospitalization. The letter does not appear in the record before us, but Teece refers to it in his report, indicating that it was not confidential. Appearing in Teece's earlier (January 7) memorandum, but not in his February 22 report, is a notation that "[a]ccording to Donald

been widely gossiped about and no leakage of confidential file fodder was necessary to broadcast it. In his conclusions, Teece takes a stance towards Smith that makes an about face from his earlier report. He writes: "I have concluded that Anne Marie Smith intentionally fabricated her allegation that confidential personnel information had been divulged. I have further concluded that it was Ms. Smith's intent to harm Mr. Gauthier and the Parents and Friends Organization." Teece proceeds to write that "objective evidence" to which he gave "particular credence" was "the testimony of State Representative Paul Caron, especially given the fact that he is a 3rd party and well known supporter of Ms. Smith." As noted above, Teece did not interview Representative Caron. His sources of information about what Representative Caron said were Fletcher and Gauthier.[5]

On March 28, 1988, Fletcher wrote to Smith. In his letter Fletcher quoted from the Teece report and wrote: "Your dishonesty in this matter has irreparably harmed and inhibited your ability to continue to perform these key management functions. Therefore . . . I am removing you from your position . . . ."

1. *Was Smith entitled to a hearing in accordance with departmental regulations?* By 115 Code Mass. Regs. § 2.03 (1987), the Department of Mental Retardation adopted the regulations of the Department of Mental Health. That achieved a carry-over of an apt and familiar set of rules which, prior to July 1, 1987, pertained to facilities and services for mentally retarded persons when those facilities and services were operated under the jurisdiction of the Department of Mental Health. See St. 1986, c. 599, §§ 9 and 62. Under the existing body of regulations, 104 Code Mass. Regs. § 24.00 (1986), dealt with departmental investigations. Section 24.01(1) prescribes a policy to investigate

---

Fletcher both he and Central Office shared this information [in the letter] with others they deemed appropriate."

[5]The plaintiff suggests that Teece's reversal of himself as to a major conclusion, without any additional investigation (Teece does not mention any), bears signs of command influence by Superintendent Fletcher.

"first, in the event of a medicolegal death of a Department client; second, whenever there is alleged to have occurred an incident which is dangerous, illegal, or inhumane; third, whenever there is alleged to exist a condition which is dangerous, illegal or inhumane; and fourth, in any other case where an investigation would be in the public interest, as determined by the person in charge or by the Commissioner or his designee." The only one of these categories which the plaintiff can hope to embrace is "an incident which is . . . illegal." Positioned as it is between the words "dangerous" and "inhumane" it is difficult to avoid the inference that "illegal" refers to an incident involving clients of the Department of Mental Retardation, and perhaps the interaction of clients and employees, but not to personnel disputes unrelated to client care.

The impression that the design of § 24.00 is to provide a procedure for investigating and dealing with complaints by or on behalf of clients of the Department of Mental Retardation is reinforced by other provisions in § 24.00. For example: § 24.03(1) provides that a complaint shall ordinarily be initiated by the person in charge (a defined term) whenever a "medicolegal death" or an incident or condition occurs or is alleged to have occurred, or when initiation of a complaint would be "in the best interests of the client, the Department, or the public"; § 24.03(2) imposes on employees the obligation to file a complaint if an employee has reason to believe that an "incident" has occurred; under the same subsection, employees are directed to assist clients in making complaints; § 24.05(6) requires that copies of reports of action taken are to be sent to the Human Rights Committee; § 24.06(1), relating to rights of an employee under a collective bargaining agreement, provides that invocation of collective bargaining grievance procedures "shall not alter the Department's responsibility under these regulations to respond to, investigate and make decisions concerning complaints and appeals initiated by clients."

We deduce from these excerpts that the purpose of 104 Code Mass. Regs. § 24.00, Department Investigations, is di-

rected to the interests of clients and to those of employees arising out of caretaking activity with clients. That conclusion is reinforced by language in the "carry-over" regulation, 115 Code Mass. Regs. § 2.03 (1) (1987), which retains in effect "regulations of the Department of Mental Health concerning programs and services for, and the rights of, mentally retarded persons." We also accord weight to the agency's construction of its own regulations. *Finkelstein* v. *Board of Registration in Optometry*, 370 Mass. 476, 478 (1976). *Cliff House Nursing Home, Inc.* v. *Department of Pub. Health*, 18 Mass. App. Ct. 112, 115 (1984). Compare *Cliff House Nursing Home, Inc.* v. *Rate Setting Commn.*, 16 Mass. App. Ct. 300, 306 (1983). The Superior Court judge correctly decided that the plaintiff was not entitled to insist that the proceedings involving her be conducted under 104 Code Mass. Regs. § 24.00.

2. *Due process rights.* As a general proposition provisional employees such as Smith, i.e., those who have no tenure or civil service status, do not have a right to notice and a trial-type hearing before discharge. *Sullivan* v. *Commissioner of Commerce & Dev.*, 351 Mass. 462, 465 (1966). *Dallas* v. *Commissioner of Pub. Health*, 1 Mass. App. Ct. 768, 771 (1974). *Ruggieri* v. *Somerville*, 10 Mass. App. Ct. 43, 45 (1980). *Rafferty* v. *Commissioner of Pub. Welfare*, 20 Mass. App. Ct. at 723-725. A provisional employee is remitted to the informal proceeding before her appointing authority provided for in G. L. c. 31, § 41. Accordingly, Monson offered her an opportunity to remonstrate about her demotion with Superintendant Fletcher and with an assistant commissioner of the Department of Mental Retardation.

Smith argues that she is entitled to something more by reason of the mark of infamy placed upon her by the second Teece report and Fletcher's demotion letter.[6] If government

---

[6]The claim to a common law or constitutionally based right to process which afforded a trial-type hearing was first made in the plaintiff's second amended complaint. So far as the docket discloses, the motion to file the second amended complaint was never acted upon. The judge, in his memorandum and decision on the plaintiff's motion for preliminary injunction and on the defendants' motion for summary judgment, twice refers ex-

action puts at stake a person's good name, reputation, honor, or integrity by a charge of dishonesty or immorality, liberty interests of the person so charged become implicated and the level of process due rises to requirements of notice and hearing at which accusers may be confronted and witnesses examined and cross-examined by counsel. *Regents of State Colleges* v. *Roth*, 408 U.S. 564, 573-575 (1972). *Bishop* v. *Wood*, 426 U.S. 341, 348-349 (1976). *Codd* v. *Velger*, 429 U.S. 624, 627 (1977). *Stetson* v. *Selectmen of Carlisle*, 369 Mass. 755, 762-763 (1976). *Costa* v. *Selectmen of Billerica*, 377 Mass. 853, 861-862 (1979). *Grant* v. *Police Commr. of Boston*, 7 Mass. App. Ct. 296, 298-299 (1979). *Ruggieri* v. *Somerville*, 10 Mass. App. Ct. at 45. *Beitzell* v. *Jeffrey*, 643 F.2d 870, 877-878 (1st Cir. 1981).

The type of damage to reputation and character referred to in the preceding paragraph must be beyond whatever obloquy stems from the loss of a job, demotion, adverse evaluations (e.g., inefficiency and incompetence), or judgments of poor job performance. See *Stetson* v. *Selectmen of Carlisle*, 369 Mass. at 761, and cases there cited; *Ruggieri* v. *Somerville*, *supra* at 45. Similarly, demotions or transfers with overtones of disciplinary action and consequent adverse effect on reputation do not, without more, give rise to a liberty interest. See *Moore* v. *Otero*, 557 F.2d 435, 438 (5th Cir. 1977); *Beitzell* v. *Jeffrey*, 643 F.2d at 878; *Altman* v. *Hurst*, 734 F.2d 1240, 1243 (7th Cir. 1984); *Baden* v. *Koch*, 799 F.2d 825, 830-831 (2d Cir. 1986).

Had the administration at Monson contented itself with demoting Smith because her strained relations with Parents and Friends and her lack of tact had ended her usefulness in a position which required cordial dealings with the public, its action would have been well within its discretion and would have given rise to no liberty interest. The bumps and reverses of a job career are not ordinarily the subject of judicial in-

pressly to the second amended complaint. As that document was before the court and considered by the court, we treat it as if duly filed and consider the issues it raised as having been brought before the Superior Court judge and before us.

quiry, absent statutory mandates. It is not the task of courts to micromanage the personnel decisions of employers. What elevates this case to a higher level of due process and judicial inquiry is the Monson administration's verdict, duly recorded, that Smith is a dishonest person who deliberately lied for the purpose of doing injury to persons and an institution on whom Monson depended for support. This is a stigma of moral turpitude and untrustworthiness of the most basic sort. To a prospective employer, someone certified as dishonest is well nigh an untouchable. If called upon for information by a prospective employer, Monson could scarcely withhold the condemning information. It is because of the destructive effect on the future of a person tainted as having acted immorally or illegally that courts have thought the individual so marked entitled to challenge the damaging allegations. See *Regents of State Colleges* v. *Roth*, 408 U.S. at 573-574; *Codd* v. *Velger*, 429 U.S. at 627-628; *Stetson* v. *Selectmen of Carlisle*, 369 Mass. at 763-764; *Costa* v. *Selectmen of Billerica*, 377 Mass. at 861-862.[7]

It remains to consider whether Smith is entitled to a trial-type hearing if the moral taint has not been disseminated. There is no assertion in this case that the charge of dishonesty has moved beyond Smith's personnel file at Monson. Some of the cases say that to maintain a claim that one has been deprived of liberty unconstitutionally by a taint of dishonesty it is necessary to establish that the taint has been published. *Bishop* v. *Wood*, 426 U.S. at 348. *Cleveland Bd. of Educ.* v. *Loudermill*, 470 U.S. 532, 547 n.13 (1985). *Grant* v. *Police Commr. of Boston*, 7 Mass. App. Ct. at 299. See *Beitzell* v. *Jeffrey*, 643 F.2d at 879. In *Stetson* v. *Selectmen of Carlisle*, 369 Mass. at 762, the court said that the right to notice and hearing attaches if the taint of immoral or illegal conduct is "*likely to be* disseminated either

---

[7]Indeed, the conclusion of intentional falsehood in this case was singular. A complaint that one has been wronged by a public official and wishes that apprehension investigated is not usually the basis for a conclusion of deliberate fabrication of allegations simply because, after investigation, the allegations are not borne out. See *Wulf* v. *Wichita*, 883 F.2d 842, 859-860 & n.26 (10th Cir. 1989).

to members of the public or to prospective employers" (emphasis supplied). Perhaps the quoted language reflects a slightly broader view than the *Bishop* and *Loudermill* cases, which came down after *Stetson*, but we think the *Stetson* opinion reflects the practical reality that certain material about a person has the quality of a time bomb. It is only a matter of time before it explodes into public view. So here. Although the raw material of governmental personnel files in Massachusetts is confidential (see G. L. c. 4, § 7, cl. 26), it is scarcely plausible that the judgment of dishonesty made by Superintendent Fletcher will not, sooner or later, travel: first, internally at Monson in connection with Smith's future work assignments; second, to any prospective employer who inquires. In responding to such an inquiry, a person from Monson, e.g., the superintendent, would be expected, in fairness to the inquirer, to allude to the substance of the stigmatizing judgment, even if holding in confidence the stigmatizing document. See *Doane* v. *Grew*, 220 Mass. 171, 178 (1915). Cf. *Bratt* v. *International Bus. Mach. Corp.*, 392 Mass. 508, 509 (1984); *Humphrey* v. *National Semiconductor Corp.*, 18 Mass. App. Ct. 132, 133 (1984). The discussion in *Grant* v. *Police Commr. of Boston*, 7 Mass. App. Ct. at 299, suggests a contrary view, but the employee in that case did not allege that the public employer had created false information about him. The issue we are now considering was not squarely presented in the *Grant* case.

We think that on the facts of the instant case, the likely dissemination of the determination of dishonesty entitles Smith to challenge the taint placed upon her. The form of that challenge includes the right to confront and examine through counsel persons on whose accounts Monson has relied and persons on whom Smith might rely.

The judgment dismissing the complaint is reversed. A judgment is to be entered declaring that the plaintiff shall be afforded a hearing before a hearing officer who is not in the chain of command at Monson and before whom the plaintiff

may examine witnesses material to whether she made any deliberately false charges.

*So ordered.*