USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 96-2165 KENNETH SILVA, Plaintiff, Appellant, v. LAWRENCE D. WORDEN, INDIVIDUALLY AND AS COMMISSIONER FOR THE CITY OF NEW BEDFORD DEPARTMENT OF PUBLIC WORKS, ROSEMARY TIERNEY, AS MAYOR, AND THE CITY OF NEW BEDFORD,  Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert Collings, U.S. Magistrate Judge] _____________________ ____________________ Before Torruella, Chief Judge, ___________ Lynch, Circuit Judge, _____________ and Stearns,* District Judge. ______________ ____________________ Philip N. Beauregard, with whom Law Offices of Beauregard ____________________ _________________________ & Burke was on brief for the appellant. _______ Kevin J. Finnerty, Assistant City Solicitor, with whom __________________ Peter J. Thomas, Assistant City Solicitor was on brief for ________________ appellees. ____________________ November 20, 1997 ____________________  ____________________ * Of the District of Massachusetts, sitting by designation. LYNCH, Circuit Judge. Kenneth Silva appeals from a LYNCH, Circuit Judge. _____________ directed verdict on his claims alleging violations of the First and Fourteenth Amendments. The First Amendment claims are that Silva was subjected to a ban on parking cars in a city employee parking lot when the cars carry political roof rack signs, that the ban was selectively enforced against him, and that the termination of his city employment was in retaliation for his support of his wife's political candidacy for city office when she ran against a candidate whom the mayor supported. The Fourteenth Amendment claim is that Silva's liberty or property interests under the Due Process Clause were violated when he was not given a name-clearing hearing before his employment was terminated for pushing another city employee. At the close of plaintiff's evidence, defendants moved for a directed verdict. The district court took the motion under advisement and then, at the close of all evidence, directed a verdict against the plaintiff as to the roof rack ban, selective enforcement, and due process claims. The court let the retaliatory firing claim against defendant Worden go to the jury, which held in favor of the defendant. The retaliatory firing claim against the City of New Bedford and Mayor were dismissed. Silva appeals the directed verdict, but not the jury finding against him on his retaliatory firing claim. We affirm. In so doing, we hold 3 that the roof rack ban was not a custom or practice so well established as to be attributable to the City through its policy-making officials. We further hold that Silva's termination did not occur under circumstances entitling him to a hearing.  I I Silva was hired by the City as an employee in the Department of Public Works on May 24, 1993. Silva was a probationary employee; as such he could not obtain full civil service status until six months after the date of his hiring. In June 1993, Ramone Silva, Silva's wife, announced her intention to run for election as City Councilor for Ward 4. Mrs. Silva was one of five candidates who sought election to this vacant seat. The leading candidate in this campaign was Joseph Fortes, a political ally of defendant Rosemary Tierney, the Mayor of New Bedford. Defendant Lawrence Worden, the DPW Commissioner, and Jose Pontes, the DPW Superintendent and manager of the city yard, were also supporters of Mayor Tierney. Because she was a write-in candidate and not on the ballot, Mrs. Silva relied heavily on signs to bring herself to the attention of voters. Such a write-in campaign is unusual in New Bedford, so Mrs. Silva's efforts received much publicity. Silva vigorously supported his wife's candidacy and worked on her behalf. Pictures of Silva and his wife 4 were widely distributed in campaign literature and published in area newspapers.  Silva worked for the DPW without incident until September 23, 1993, when Silva went to the supply area to get work gloves and was ignored by the supply clerk, Timothy Lobo. Lobo, a supporter of Mayor Tierney, knew that Silva's wife was campaigning against Fortes. Lobo refused to give any gloves to Silva, telling him he "was not important." When Silva later approached Lobo to discuss the incident, a physical altercation resulted in which Silva pushed Lobo. While no one was injured and the incident was treated by both parties as "no big deal," Lobo reported the incident to Pontes. Pontes called Silva to his office and chastised Silva for the incident. Pontes also told Silva to remove his car from the city yard, where Silva had parked. The city yard is a large area, primarily containing the DPW Highway Department, where DPW employees commonly park. Silva's car had a roof rack advertising his wife's candidacy for City Councilor. Pontes told Silva that city policy prohibited employees from parking cars with political roof rack signs in the city yard. There was evidence that other DPW employees had parked their personal cars in the city yard with political roof rack signs advocating other candidates for public office. Some DPW employees also had bumper stickers 5 on their cars. But no other person, except Silva, has recently been instructed to move his or her car. Silva relocated his car and never parked in the city yard again.  Pontes, as DPW Superintendent, was second in the DPW heirachy below Worden. Commissioner Worden, not Superintendent Pontes, ran the agency. Pontes supervised the day-to-day operations of the DPW. While Worden had formal authority over the city yard, Pontes administered the yard on a daily basis, a responsibility traditionally exercised by the DPW Supervisor. On September 24, 1993, Pontes gave Silva a written warning indicating that Silva "pushed Tim Lobo" and recommending that Silva's probation be extended. Silva refused to sign the warning. Pontes sent a copy of the warning to the union steward and placed a copy in Silva's personnel file. Although Pontes instructed Silva that he would be given a hearing before Worden, as was customary practice for probationary employees, Silva was never contacted by Worden for this purpose. On October 7, 1993, Silva received a letter signed by Worden discharging him because of the events giving rise to the warning. Worden never spoke to Silva about the discharge and declined to grant Silva a hearing at which Silva might defend himself. Silva was unable to find other 6 work for two years. On election day, 1993, Mrs. Silva defeated Fortes for the Ward 4 seat.  In April 1994, Silva sued the City, Mayor Tierney, and Worden under 42 U.S.C. 1983 and Mass. Gen. Laws ch. 12 11H,I (the state civil rights acts), claiming that the roof rack ban violated the First Amendment, that it was selectively enforced against him, that he was discharged in retaliation for his support of his wife's candidacy, and that the City's failure to provide him a name-clearing hearing prior to his discharge violated his liberty interests under the Due Process Clause of the Fourteenth Amendment.  At trial, Commissioner Worden testified that Pontes had informed him there was a longstanding city "policy" set by the DPW Superintendents prohibiting political roof rack signs in the city yard, although Worden also testified that he had no knowledge of any such practice until after Silva had filed suit against the City. Pontes testified that the policy had been first instituted by a DPW Superintendent in the 1970's and was continued by later Superintendents, including Pontes. Pontes and Lobo both testified that they remembered past incidents of people being asked to move their cars on account of political roof racks.  At the close of Silva's case, defendants moved for a directed verdict. The court reserved ruling on the motion and instructed the defendants to proceed with their case, 7 "understanding that I'll be judging the evidence as of this point, without considering the evidence that you introduce, rather than keep the jury waiting." After the defendants completed presenting their evidence, they renewed their motion for directed verdict, which the court granted. The court let the retaliatory firing claim go to the jury, which found in favor of Worden, the sole remaining defendant. II II In reviewing a directed verdict under Fed. R. Civ. P. 50(a), "we take the evidence most favorable to the losing party and ask de novo whether a reasonable jury had inevitably to decide in favor of the victor." Abraham v. __________ Nagle, 116 F.3d 11, 13 (1st Cir. 1997).  _____ We consider all evidence offered during trial, including evidence introduced by the defendants. We do this notwithstanding the defendants' motion for directed verdict at the end of Silva's case and the court's statement that it would rule, although at the close of all evidence, only on the plaintiff's evidence. The court's reservation on the initial motion at the end of Silva's case acted as a denial of the motion, upon which the City had the choice of either standing on its motion or proceeding with its evidence. The defendants chose to proceed with their evidence, and this court must now view all of the evidence presented. See ___ Gillentine v. McKeand, 426 F.3d 717, 722-23 (1st Cir. 1970); __________ _______ 8 A & N. Club v. Great American Ins. Co., 404 F.2d 100, 103-104 ___________ _______________________ (6th Cir. 1968) (citing O'Malley v. Cover, 221 F.2d 156, 158- ________ _____ 59 (8th Cir. 1955)). Moreover, the court held that directed verdict was proper based both on Silva's evidence alone and on all evidence presented during the trial, thereby effectively making two separate rulings. In reviewing a directed verdict, the appellate court "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir. ___________________ 1987). "Nevertheless, the evidence to which the nonmovant points must comprise more than fragmentary tendrils: a mere scintilla of evidence is not enough to forestall a directed verdict, especially on a claim or issue as to which the burden of proof belongs to the objecting party." Fashion _______ House, Inc. v. K Mart Corp., 892 F.2d 1076, 1088 (1st Cir. ____________________________ 1989) (citations omitted). We repeat the procedural context. A jury heard and rejected the retaliatory firing claim. At issue here is the potential liability of the City on the other First Amendment claims and the due process claim. With this in mind, we face the central questions in this appeal: (1) whether Pontes is a "policymaker" under Monell v. Department of Social Services, ______ ______________________________ 436 U.S. 658 (1978) and its progeny, (2) whether the City had a "policy" or "custom" of banning political roof rack signs, 9 and (3) whether Silva was deprived of a liberty interest under the Due Process clause of the Fourteenth Amendment by the method of his termination. We answer each question in the negative. A. Municipal Liability ___________________ In Monell, the Supreme Court held that a ______ municipality may not be held vicariously liable under 1983 for the torts of an employee solely on the basis of its employer-employee relationship with the tortfeasor. Id. at ___ 691. Instead, a plaintiff seeking to impose liability on a municipality under 1983 must identify a municipal "policy" or a "custom" that caused the plaintiff's injury. See Board ___ _____ of County Comm'rs of Bryan County v. Brown, 117 S.Ct. 1382, ___________________________________ _____ 1388 (1997); Pembauer v. Cincinnati, 475 U.S. 469, 479-81 ________ __________ (1986); Monell, 436 U.S. at 694. The disputed "policy" or ______ "custom" must also be the cause and moving force behind the deprivation of constitutional rights. See Bryan County ___ _____________ Comm'rs, 117 S.Ct. at 1388. Because neither policy nor _______ custom is shown here, we do not reach the causation issue. A municipality may be held liable for acts taken pursuant to a "policy by at least two methods:1 when the  ____________________ 1. Justice Souter, in his dissenting opinion in Bryan _____ County Comm'rs, identifies three alternatives: (1) where the ______________ appropriate office promulgates a generally applicable statement of policy and the subsequent act is simply an implementation of the policy; (2) where no rule has been announced but federal law has been violated by the act of the policymaker itself; (3) where the policymaker has failed to 10 deprivation resulted (1) "from the decisions of its duly constituted legislative body", or (2) from the decisions "of those officials whose acts may fairly be said to be those of the municipality." Id. In such cases, "[m]unicipal ___ liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to _______________ the action ordered." Pembauer, 475 U.S. at 481 (emphasis ________ added).  Liability may also be premised on a "custom" which caused plaintiff's injury. In particular, a municipality might be held liable when the plaintiff is injured by "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker [when] the relevant practice is so widespread as to have the force of law." Bryan County Comm'rs, 117 S.Ct. at 1388. As this court _____________________ explained in Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir. _________ ______ 1989), one method of showing custom is to demonstrate that the custom or practice is so "wellsettled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Id. at 1156. ___  ____________________ act affirmatively at all, so long as the need to control the agents of government is so obvious, and the inadequacy of the existing practice so likely to result in violation of existing right, that the policymaker can be said to be "deliberatively indifferent". Bryan County Comm'rs, 117 _____________________ S.Ct. at 1395. None of this trilogy can be said to be true here. 11 The evidence presented in this case does not demonstrate the existence of either a policy or a custom under 1983. First, Pontes, the individual who told Silva he could not park in the city yard, is clearly not the "final authority" in the city yard. The City Code of New Bedford specifically provides that "[t]he commissioner of public works under the direction of the mayor and the city council shall . . . [h]ave the charge of the city yard . . . ." New Bedford City Code 19-143; see also Jett v. Dallas __________ ____ ______ Independent School Dist., 491 U.S. 701, 737 ("[W]hether a _________________________ particular official has 'final policymaking authority' is a question of state law." (quoting St. Louis v. Praprotnik, 485 _________ __________ U.S. 112, 123 (1988))). Thus Worden, as DPW Commissioner, was Pontes's superior in matters concerning the city yard and ultimately responsible for the manner in which the yard was run. That Worden acknowledged at trial that Pontes was "the head guy" at the yard is insufficient, without more, to demonstrate that Worden delegated final decisionmaking authority regarding the yard to Pontes. This is especially true in light of Worden's assertions at trial that Pontes, as DPW Superintendent, was "directly beneath my position," and that "I am the department head." We agree with the district court's assessment that Pontes's discretion to run the yard does not constitute final decisionmaking authority which might trigger liability under 12 1983 as interpreted by Bryan County Comm'rs and Pembauer. ____________________ ________ Pontes's testimony that an unidentified DPW Superintendent in the 1970's first came up with the roof rack ban does not suffice. Such a decision was not made by New Bedford's legislative body; nor are superintendents, who are second-in- command figures, the final authority to establish DPW policy. Second, Silva has not met the burden of showing a "custom" under Bordanaro. The roof rack ban was not so _________ "wellsettled and widespread" as to have force of law, nor is there sufficient evidence that the City's policymaking officials could be said to have had actual or constructive knowledge of the practice. See Bordanaro, 871 F.2d at 1156- ___ _________ 57. At the close of evidence, witnesses such as Lobo and Pontes could only remember a few instances over the last twenty years when any roof rack policy had been enforced. More significantly, Commissioner Worden testified that he did not even know of the existence of a roof rack ban until several months after Silva had been fired and, indeed, not until after Silva had filed suit against the City. Moreover, there is no evidence that Mayor Tierney or other high ranking city officials, or prior policymakers, were even aware of the practice, much less that they did nothing to end it. We do not suggest that, and need not reach the issue of whether, a flat ban on political roof racks on cars in city employee parking lots is unconstitutional. Even if Silva's "custom" 13 claim is recast as involving a custom of selective enforcement of such a ban depending on which candidate's sign is displayed, a far more potent constitutional claim, the claim still fails for want of evidence that it involves a custom.  Under Bordanaro, in order to show that City _________ officials had constructive knowledge of the practice, the plaintiff must show that "the practices have been so widespread or flagrant that in the proper exercise of their official responsibilities the municipal policymakers should have known of them." Bordanaro, 871 F.2d at 1157 (citations, _________ internal quotation marks, and alterations omitted). In Bordanaro, the plaintiff had presented considerable evidence _________ demonstrating a comprehensive failure by the defendant City of Everett to train and monitor the actions of its police officers, and the court found that the evidence demonstrated the existence of a widespread practice of which the defendant's policymaking officials should have been aware. See Id. at 1159-61. In contrast, the evidence in this case ___ ___ at best suggests a practice, sporadic at most, of which only some lower-level managerial employees were aware. This evidence is insufficient to show that the City's policymaking officials had constructive notice of the practice. B. Due process considerations __________________________ 14 Silva claims he was deprived of a liberty interest under the Due Process clause of the Fourteenth Amendment by the termination of his employment in that the termination stigmatized him and damaged his ability to obtain other employment. Silva further argues that the City violated his right to due process by refusing to grant him a hearing at which he might clear his name. The Supreme Court has held that termination of at- will employment, even when accompanied by statements which might be characterized as defamatory, is insufficient by itself to implicate a constitutionally protected liberty or property interest. See Bishop v. Wood, 426 U.S. 341, 348-49 ___ ______ ____ n. 13 (1976); Board of Regents v. Roth, 408 U.S. 564, 572 _________________ ____ (1972). Despite the "drastic effect of the 'stigma' which may result from defamation by the government in a variety of contexts, . . . reputation alone, apart from some more tangible interests such as employment, is [n]either 'liberty' [n]or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." Paul v. ____ Davis, 424 U.S. 693, 701 (1976). Rather, the reputational _____ injury must be accompanied by a change in the injured person's status or rights under substantive state or federal law. See Id. at 710-12. ___ ___ We interpreted these requirements in Beitzell v. ________ Jeffrey, 643 F.2d 870 (1st Cir. 1981), stating that "the _______ 15 Fourteenth Amendment procedurally protects reputation only where (1) government action threatens it, (2) with unusually serious harm, (3) as evidenced by the fact that employment (or some other right or status) is affected." Id. at 878 ___ (footnote and citations omitted). Moreover, the municipality terminating the employee must also be responsible for the dissemination of defamatory charges, in a formal setting (and not merely as the result of unauthorized "leaks"), and thereby significantly have interfered with the employee's ability to find future employment. Id. at 879.  ___ Massachusetts law, under the State Constitution, may have a slightly broader conception of the liberty interests protected by due process in this sort of case. Such liberty interests have been found in the absence of formal charges where the allegedly defamatory statements are "likely to be disseminated either to members of the public or to prospective employers." See Smith v. Commissioner of ___ _____ ________________ Mental Retardation, 28 Mass. App. Ct. 628, 636-37 (1990), __________________ rev'd on other grounds, 409 Mass. 545 (1991). But the right ______________________ to a hearing still only attaches when the damage to plaintiff's character is very serious. As the court stated in Smith, _____ The type of damage to reputation and character . . . must be beyond whatever obloquy stems from the loss of a job, demotion, adverse evaluations (e.g., inefficiency and incompetence), of judgments of job performance. Similarly, 16 demotions or transfers with overtones of disciplinary action and consequent adverse effect on reputation do not, without more, give rise to a liberty interest. Id. at 635 (citations omitted); see also, Stetson v. Board of ___ ________ _______ ________ Selectmen, 369 Mass. 755, 761 (1976) (To "constitute a _________ deprivation of liberty based on serious damage to one's standing in the community, more must be shown than mere allegations of incompetence or inefficiency at a particular job.") The evidence does not meet these requirements. There is no evidence that the basis for Silva's termination, that Silva "pushed Tim Lobo", was ever disseminated in a formal setting, as required under federal law. Even assuming the state standard is different, there was no dissemination to the public or to prospective employees. The termination letter that passed through the City personnel department remarked only on Silva's "unsatisfactory conduct and job performance". The employee warning written by Pontes stated only that Silva "pushed Tim Lobo" and was not publicly disseminated. Silva's union representative was aware of the incident only because Silva requested the representative's presence when Pontes issued his warning. That Worden interviewed a witness to the incident is insufficient to constitute dissemination. Finally, that the incident was discussed by other employees in the city yard is not evidence 17 that the incident was published by Worden or any other city official or was the basis for a formal charge requiring due process protections. In sum, we find no evidence supporting the claim that Silva's termination was accompanied by defamatory formal charges or statements that were disseminated by city officials. Nor do we find evidence that Silva's subsequent difficulty in obtaining employment resulted from the City's discharge of Silva for unsatisfactory conduct and job performance. Affirmed. Costs to the defendants. ________ 18