# United States Court of Appeals
## For the First Circuit

No. 05-1015

FRAN BURTON,

Plaintiff, Appellant,

v.

TOWN OF LITTLETON, VINCENT FRANCO, and GERARD DERY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Selya and Lynch, Circuit Judges,
and Restani,[*] Judge.

Floyd H. Anderson, with whom Law Offices of Floyd H. Anderson,
P.C. was on brief, for appellant.
Patricia M. Rapinchuk, with whom Dorothy Varon and Robinson
Donovan, P.C. were on brief, for appellees.

October 14, 2005

---

[*]    Chief Judge of the United States Court of International
Trade, sitting by designation.

**LYNCH**, **Circuit Judge**.  This case raises the question of what constitutes public dissemination of allegedly false and defamatory information sufficient to trigger due process hearing protections for public employees.  See Bd. of Regents v. Roth, 408 U.S. 564, 573 (1972).  The controversy arose from the termination of Fran Burton from her job as a public school teacher in Littleton, Massachusetts.  The public dissemination is said to be the sending of a copy of the termination letter by the superintendent of the local school district to the state Commissioner of Education.  The superintendent copied the letter to the Commissioner because the basis for the termination was pertinent to the teacher's certification, which is a responsibility entrusted to the Commissioner.  We hold, on the particular facts of this case, that no public dissemination occurred and that there was thus no deprivation of Burton's liberty interests sufficient to trigger the obligation to have a name-clearing hearing.  See Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 103 (1st Cir. 2002).  We affirm the district court's grant of judgment as a matter of law in favor of the defendants, which it had issued at the close of Burton's case-in-chief on both the due process claim and her related employment discrimination claims.

**I.**

We recount the evidence in the light most favorable to the plaintiff.  Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002).  On

September 5, 2000, Fran Burton, a licensed teacher and therapist, was hired as an art teacher at Russell Street Elementary School in Littleton. Around lunch hour on September 14, 2000, two days after Burton began teaching at the school, "JH," an eleven-year-old student in the fifth grade, informed Gerard Dery, the school principal, that Burton had hit him in art class that morning. According to JH, he was leaning forward in his seat talking quietly with another student at his table when Burton approached and "karate chopped" him three times on his left arm. Burton, he said, did not seem upset when she struck him; she merely directed him to sit by himself at an "isolation table." JH indicated that the physical contact resulted in a brief, "Charley horse" pain, but that it left no marks or bruises.

Dery reported JH's allegations to Vincent Franco, the superintendent of the Littleton public schools. Franco, who knew JH because he had worked with JH's grandfather when the grandfather served as assistant superintendent, questioned JH again. According to Dery's incident report, JH retold his story, in a manner consistent with what he had told Dery, to Franco and JH's father. Additionally, three of JH's friends, "SJ," "JT," and "KR" -- all of whom allegedly witnessed the incident -- substantiated his account.[1]

_____

[1] As we discuss in greater detail below, a fourth student, "SK," later offered what a Department of Social Services investigator called "a dramatically different account of what had

-3-

At the end of the school day, Dery confronted Burton with the allegations. Burton denied that she had ever hit a student. She also demanded to confront the complainant, a request that Dery refused. Dery then placed her on administrative leave pending further investigation.

On September 18, 2000, Burton called Franco to determine her status. Franco told her that she was being fired based upon "creditable" reports that she had hit a student. He said that he had prepared a letter to Burton formally notifying her of her termination and explaining the charges against her. He apprised her that a copy of the letter had been sent to David Driscoll, the Massachusetts Commissioner of Education, as, indeed, it had been. He further informed Burton that he had already reported the incident to the state Department of Social Services (DSS) because he had "reasonable cause to believe that [her actions] constitute[d] child abuse within the meaning of" state law. See Mass. Gen. Laws ch. 119, § 51A. During this conversation, Franco denied Burton the opportunity to respond further to the allegations and rebuffed her request to see the evidence against her. Burton alleges that Franco concluded the call by calling her an "old Jew bitch," an allegation that we must take as true given the procedural posture of the case.

---

happened" when the investigator interviewed him six days after the incident. No other student came forward regarding the incident.

Franco had referred the matter to DSS, which investigates child abuse allegations, on September 15, 2000. A DSS investigator conducted interviews with the relevant individuals from September 18 to 25, 2000. In a report dated September 26, 2000, she made the following determinations: first, the three initial witnesses, all friends of JH, had spoken with JH before providing identical accounts of the incident to Dery and the investigator; second, a guidance counselor observed one of those witnesses, KR, talking and demonstrating the three "karate chops" to a fourth student, SK, prior to SK's interview with the investigator; third, SK, who was interviewed by the investigator but not by Dery or Franco, nevertheless set forth a markedly different version of the incident; and fourth, JH had neither asked to see a nurse nor exhibited any signs of distress during the class that took place in the interval between Burton's art class and the time he reported the incident to the principal. On account of these findings, among others, the DSS investigator concluded that "there is no reasonable cause to believe that the condition of physical abuse exists." She made no specific determinations as to whether there was reasonable cause to support the allegation that Burton had hit JH. The DSS report was not placed in Burton's personnel file; the only documentation retained in her file about her termination were Franco's letter and a form stating that the reason for Burton's discharge was "hit student."

Burton testified at trial that despite persistent efforts, she has been unable to secure a position as a teacher or therapist ever since her discharge from the Littleton position. She attributed her unemployment and accompanying emotional distress to the accusation against her and the subsequent denial of any opportunity to refute it.

**II.**

Burton filed in federal district court an initial complaint on June 13, 2001 and an amended complaint on April 2, 2002 against Dery, Franco, and the Town of Littleton ("Town"). She asserted twelve claims, including 42 U.S.C. § 1983 claims against Dery, Franco, and the Town for violation of her liberty interest under the Due Process Clause of the Fourteenth Amendment, as well as religious and age discrimination claims against the Town under state and federal law.[2]

Jury trial commenced on November 29, 2004. Upon the conclusion of Burton's case-in-chief, defendants moved for judgment as a matter of law on all claims pursuant to Fed. R. Civ. P. 50(a)(1). The district court granted defendants' motion on December 2, 2004. It also determined that individual defendants were entitled to qualified immunity for the due process claims.

---

[2] Before trial commenced, Burton agreed to drop the § 1983 claim against Dery.

-6-

On appeal, Burton claims error in both rulings.  She also asserts that the district court erred in preventing her from offering evidence with respect to damages.  Finding no error on the part of the district court, we affirm.

**III.**

Appellate review of the grant of a Rule 50(a) motion is de novo.  Espada, 312 F.3d at 2.  We review the evidence, taking all inferences in favor of Burton, and ask whether a reasonable jury could have found defendants liable based on the evidence presented.  Isom v. Town of Warren, 360 F.3d 7, 9 (1st Cir. 2004).

**A.        Due Process Claims**

Burton argues that the district court erred in granting judgment as a matter of law on her due process claims against the Town and Franco.  Burton's complaint is that defendants ought to have granted her request for a name-clearing hearing, and that their failure to do so constituted a deprivation of her liberty actionable under 42 U.S.C. § 1983.

Even where an employee has no property interest in continued employment,[3] there are nonetheless circumstances in which

_____

        [3]    This case does not involve a claim that due process rights arise from the deprivation of a property interest.  Burton has no property interest in her position, see Mass. Gen. Laws ch. 71, § 42 (requiring written notice of intent to dismiss and opportunity for review of dismissal only for teachers that have been in the school system for at least ninety days); Gomez v. Rivera Rodriguez, 344 F.3d 103, 111 (1st Cir. 2003) ("Under ordinary circumstances, an at-will employee lacks a reasonable expectation of continued employment (and, thus, has no property

-7-

a public employer's decision to discharge an employee "may damage the employee's reputation to such an extent that his 'liberty' to seek another job is significantly impaired." Ortega-Rosario v. Alvarado-Ortiz, 917 F.2d 71, 74 (1st Cir. 1990); see also Roth, 408 U.S. at 573. Although "neither the termination of employment nor statements that might be characterized as defamatory are, by themselves, sufficient to implicate the liberty interest," Ortega-Rosario, 917 F.2d at 74, "where a public-sector employer creates and disseminates a false and defamatory impression about an employee in connection with the employee's discharge," the Due Process Clause "require[s] the employer to provide the employee with an opportunity to dispute the defamatory allegations," and the employer's failure to do so is actionable under § 1983. Wojcik, 300 F.3d at 103. Wojcik discusses the nature of the evidence to be presented:

> First, the alleged statements must level a "charge against [the employee] that might seriously damage his standing and associations in his community" and place his "good name, reputation, honor, or integrity . . . at stake." . . . Second, the employee must dispute the charges made against him as false. Third, the stigmatizing statements or charges must have been intentionally publicized by the government. That is, the defamatory charges must have been aired "in a formal setting (and not merely the result of unauthorized 'leaks')." Fourth, the stigmatizing statements must have been made in conjunction with an alteration of the employee's legal status, such as the termination of his

interest in her job)."), and she makes no claim to that effect.

> employment. Finally, the government must have failed to comply with the employee's request for an adequate name-clearing opportunity.

Id. (alteration and first omission in original) (citations omitted).

Here, the parties have focused on the third Wojcik element, the requirement that "the stigmatizing statements or charges . . . [be] intentionally publicized by the government." Id. (internal quotation mark omitted).[4] But Wojcik was concerned with a different problem: whether the intentionality requirement of the public dissemination prong had been met. In Wojcik, the requirement was not met when the publication was by the media, which wrongly, and in a defamatory manner, interpreted accurate statements by the defendant employer. Id. at 103-04. Our law is that it takes a more formal statement to constitute intentional publication. See Silva v. Worden, 130 F.3d 26, 32-33 (1st Cir. 1997) (noting that a plaintiff must show that defendants disseminated the "defamatory charges, in a formal setting (and not merely as the result of unauthorized 'leaks'), and thereby significantly have interfered with the employee's ability to find future employment").

---

[4] There is no dispute that the first two Wojcik elements are satisfied in this case, although the defendants assert that the statements at issue were neither false nor defamatory and thus fail to meet the threshold requirement for a deprivation of liberty claim under Wojcik. Finding other grounds on which to dispose of this case, we do not reach this issue.

-9-

Plaintiff's case presents a different problem than the intentionality of the employer's dissemination. The only dissemination Burton points to on appeal is the termination letter that Franco copied and sent to the Commissioner of Education.[5] This dissemination was no doubt intentional. In Bishop v. Wood, 426 U.S. 341 (1976), however, the Supreme Court held that an employee's liberty interest was not jeopardized where the intentional dissemination of the reasons for that employee's discharge was not public. See id. at 348. It is the public disclosure requirement that is at issue here.

Burton contends that Franco's copying of the letter to the Commissioner constitutes public dissemination within the

---

[5] In her brief and at trial, Burton emphasized the apparent lack of established procedures governing what information should be given out -- and by whom -- when references for teachers were requested from defendants. Her emphasis on defendants' recordkeeping policies seems to be an attempt to attribute, without evidence of actual dissemination, her unemployment to the materials kept in her personnel file. Our precedents, however, have firmly established that dissemination cannot be proved by mere innuendo; the plaintiff must marshal sufficient "evidence to support a conclusion that any of the prospective employers requested, or that the defendants divulged, information regarding the circumstances surrounding [her] termination." Ortega-Rosario, 917 F.2d at 74-75; cf. Roth, 408 U.S. at 574 ("Mere proof . . . that [plaintiff's] nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'"). No such evidence appears in the record.
Burton also alluded in her complaint and at trial to comments that Franco and Dery purportedly made to school personnel, as well as to parents and students involved in the incident, about the termination of her employment. Burton does not rely on these alleged comments on appeal, nor would reference to mere rumors or leaks have been helpful to her § 1983 claim. See Silva, 130 F.3d at 32-33.

meaning of <u>Bishop</u> and its progeny because his action put her reputation and future employment opportunities "at stake" and left her no longer "as free as before to seek" other employment. <u>Roth</u>, 408 U.S. at 573, 575. We think not, for several reasons.

First, this type of disclosure is not the classic type of public dissemination we have found actionable. As noted in <u>Beitzell</u> v. <u>Jeffrey</u>, 643 F.2d 870 (1st Cir. 1981), we typically have found deprivation of a liberty interest only "when the state has made seriously defamatory charges in public, for example, at public meetings or to the press." <u>Id.</u> at 879 (collecting cases). It would quite stretch the traditional analysis of what is public to cover the present situation.

There is no reason to make that stretch. Doing so does nothing to advance the objectives of the doctrine established by <u>Roth</u> and by <u>Bishop</u>. That doctrine aims to balance two objectives. It seeks to protect employees from serious harm to their future employment opportunities. In order for that harm to exist, there must be sufficient dissemination to actually create such a risk. The doctrine, however, also seeks to avoid defining public dissemination so broadly as to impair the normal functioning of personnel operations in public agencies. Resolution of the tension between these two objectives will turn on the facts of each case, and we do not set a template. On the facts here, neither objective would be served by holding that the sending a copy of the letter to

-11-

the Commissioner, without proof of any further dissemination by the Commissioner, meets the requirement for public dissemination.

Burton's argument unmoors the language of Roth and Bishop from its berth in the reasoning of both cases. The constitutional tort is a narrow one. See Ratliff v. City of Milwaukee, 795 F.2d 612, 626-27 (7th Cir. 1986) ("In a common law defamation action, any publication of false and defamatory material might be sufficient, but in the context of the liberty interest protected by the Fourteenth Amendment, [plaintiff] was required to show broader publication."). We return to Bishop to explain why.

Bishop is concerned not with hypothetical or merely possible reputational harms to public employees, but with significant infringements on their liberty interests. As Bishop points out, absent public disclosure, there can hardly be any harm. Bishop, 426 U.S. at 348 (holding that a communication that was not made public "cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired" (quoting Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971))).

Consistent with Bishop, we have emphasized in our caselaw that public dissemination is the sine qua non of a due process claim based on reputational harm: "[T]he due process requirement that [an employee] be afforded a hearing at which he may seek to clear his name is triggered only if the dismissal is based upon

-12-

false and defamatory charges that are <u>disseminated</u> by the employer and stigmatize the employee so that the employee's freedom to obtain alternative employment is <u>significantly</u> impaired." <u>Ortega-Rosario</u>, 917 F.2d at 74 (emphases added). We have thus rejected due process claims based on alleged reputational harm where there was no dissemination to the public or to prospective employers of the details of plaintiff's termination. <u>See, e.g.</u>, <u>Wojcik</u>, 300 F.3d at 103; <u>Silva</u>, 130 F.3d at 33. Accordingly, the placement of damaging information in a personnel file, without further dissemination, is not sufficient to trigger the constitutional tort. <u>See</u> <u>Nethersole</u> v. <u>Bulger</u>, 287 F.3d 15, 21 n.7 (1st Cir. 2002) ("The protection of liberty interests is [not] violated . . . by the presence of adverse information in a personnel file, standing alone . . . ." (quoting <u>Hardemon</u> v. <u>City of Boston</u>, 144 F.3d 24, 28 (1st Cir. 1998) (per curiam)) (alteration and omission in original)); <u>Silva</u>, 130 F.3d at 33; <u>see</u> <u>also</u> <u>Johnson</u> v. <u>Martin</u>, 943 F.2d 15, 17 (7th Cir. 1991).

The letter to the Commissioner, like other personnel documents, is not a public record under state law and not subject to public disclosure.[6] <u>See</u> Mass. Gen. Laws ch. 4, § 7 (exempting "personnel . . . files or information" from disclosure under the public records statute, <u>id.</u> ch. 66, § 10); <u>Wakefield Teachers Ass'n</u> v. <u>Sch. Comm.</u>, 731 N.E.2d 63, 67 (Mass. 2000) (defining "personnel

---

[6] If the Commissioner were obligated to release the document, this would be a different case.

-13-

[file] or information" to include, at a minimum, "disciplinary documentation, and . . . termination information pertaining to a particular employee").  Essentially a form of internal communication, Franco's copying of the letter to the licensing authority[7] is not public in the same way that correspondence with a third party such as the media or a prospective employer is public.  Cf. McMath v. City of Gary, 976 F.2d 1026, 1035 (7th Cir. 1992) ("[S]tigmatizing information that has not been disseminated beyond the proper chain of command has not been made public."); Ratliff, 795 F.2d at 626-27 (same).  Burton was not seeking employment with the Commissioner of Education, and there is no evidence that the disclosure to the Commissioner, who could not in turn release the information to the public, resulted in the disclosure of information relating to Burton's termination to potential school system employers.  The risk of harm to Burton's

---

[7]    The Commissioner is charged with broad oversight of the educational system, including the authority to grant, suspend, or revoke licenses of school personnel.  See Mass. Gen. Laws ch. 69, §§ 1A, 1B; id. ch. 71, § 38G.  Accordingly, it was reasonable for Franco to report to him that a teacher was being terminated on account of behavior that could potentially affect licensure.  Cf. id. ch. 71, § 38G; 603 Mass. Code Regs. 7.14(8)(a).  Paul Livingston, the current superintendent of the Littleton schools and one of Burton's own witnesses, confirmed that during September 2000, when he was superintendent of another school district in Massachusetts, he understood that he was obligated to report to the Commissioner any termination based on an attribute that would affect licensure.  Indeed, later revisions in law, not in effect at the time, imposed a specific obligation on superintendents to report exactly such information to the Commissioner.  See 603 Mass. Code Regs. 7.14(8)(h).

ability to get a job is too ephemeral for this disclosure to constitute public dissemination under Bishop.[8]

Bishop's second concern is that the ability of individuals in defendants' position to communicate within a single system of employment -- say, between employer and employee -- not be impaired by an overly broad understanding of what constitutes a public dissemination. See Bishop, 426 U.S. at 348-49 (declining to adopt a conception of dissemination that would "penalize forthright and truthful communication between employer and employee"). In part for this reason, we have held that where an employer interviews a relevant witness as part of an investigation, sends a union representative a copy of a disciplinary letter at the request of an employee, or passes a termination or disciplinary letter through the employer's personnel department, there is no public dissemination. See Silva, 130 F.3d at 29, 33. Burton's theory of public dissemination ignores these precedents, threatening public agencies with exactly the sort of micromanagement against which the

_____

[8] It is true that loss of certification would have severely hurt Burton's job prospects as a teacher. But the letter itself could not have led to such a result; present state regulation provides for notice and hearing before the Commissioner revokes, suspends, or limits the license of any teacher, see 604 Mass. Code Regs. 7.14(8)(c), (e), and there is no claim that such procedures would not have been used earlier. Having produced no proof of any other adverse consequences that directly flowed from the correspondence between Franco and the Commissioner, Burton "stretches the concept too far [by] suggest[ing] that a person is deprived of 'liberty' when [she] simply is [terminated] in one job but remains as free as before to seek another." Roth, 408 U.S. at 575.

-15-

Bishop Court cautioned. See id. at 349-50 ("The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies.").

Burton's theory of what constitutes public dissemination, if endorsed, would likely discourage local superintendents from privately, if officially, communicating appropriate concerns about teachers to the Commissioner in his capacity as a licensing authority. See Bishop, 426 U.S. at 348-49. It would also undermine the state legislature's decision to create a probationary period in which new teachers can be terminated without process. See Mass. Gen. Laws ch. 71, § 42; Brennan v. Hendrigan, 888 F.2d 189, 196 (1st Cir. 1989) (declining, where there was no public dissemination of defamatory charges, to require a name-clearing hearing, in part because "[t]o require it would simply erase in many instances the constitutional distinction between the 'at will' and the 'tenured' employee" (quoting Laureano-Agosto v. Garcia-Caraballo, 731 F.2d 101, 104-05 (1st Cir. 1984))); see also Olivieri v. Rodriguez, 122 F.3d 406, 409 (7th Cir. 1997) (expressing concern that allowing plaintiffs to prove reputational harm by potential, rather than actual, dissemination "comes close to arguing that there is no such thing as probationary public employment").

There is some irony in this case. Burton's lawsuit -- brought, to be sure, after she had difficulty finding work as a

teacher -- has now made public the reasons for termination of her employment, as was not true before. Whether the defendants acted too hastily or unfairly in discharging Burton is not before us. See Bishop, 426 U.S. at 350 ("The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions."). On the far narrower issue, which is before us, of whether Burton has proven public dissemination of information within the meaning of Roth, we conclude she has not.[9]

---

[9]     Burton makes two additional arguments related to her due process claim. First, she argues that the district court erred in granting Franco qualified immunity on the § 1983 claim. Having declared above that Burton has failed to establish a liberty interest sufficient to trigger due process protections, we need not engage the qualified immunity issue. See Ruiz-Casillas v. Camacho-Morales, 415 F.3d 127, 134 (1st Cir. 2005) ("The failure of appellant's constitutional claims obviates our need to address the qualified immunity defense . . . .").

    Second, Burton contends that the court made an error on the admissibility of evidence. She claims that the district court erred in prohibiting her from offering evidence of damages arising from her failure to receive a name-clearing hearing. Contrary to Burton's allegation, on our perusal of the record, we find ample testimony about damages. The only limitation the district court issued with respect to damages evidence was to preclude Burton from entering into evidence job applications that ask the applicant to self-report her reasons for leaving her previous job. The district court so ruled because it correctly determined that under both the Massachusetts state law of defamation and the federal caselaw on § 1983, self-compelled publication is not a cognizable form of publication or dissemination. See White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1038-39 (Mass. 2004); Silva, 130 F.3d at 32-33; Olivieri, 122 F.3d at 408-09. We find no error in the district court's refusal to admit the job applications.

-17-

**B.** **Employment Discrimination Claims**

Finally, Burton appeals the district court's grant of judgment as a matter of law in favor of the defendants on her claims of religious and age discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), the Age Discrimination Employment Act, 29 U.S.C. §§ 621-34, and Mass. Gen. Laws. ch 151B.  The claims rely almost entirely on Franco's purportedly calling Burton an "old Jew bitch."  If made, as we must assume it was, the statement is reprehensible.

Before the district court, Burton styled her complaint as a mixed-motive case, see 42 U.S.C. § 2000e-2, and disavowed the burden-shifting framework of McDonnell Douglas v. Green, 411 U.S. 792 (1973).  She maintains this mixed-motive theory on appeal. Under this theory, she must present evidence of discrimination on the basis of a forbidden bias, at which point defendants must then either "deny the validity or the sufficiency of the [employee's] evidence, and [have] the jury . . . decide[] whether the [employee] has proved discrimination by a preponderance of the evidence, or prove that it would have made the same decision even if it had not taken the protected characteristic into account."  Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 429 (1st Cir. 2000) (second and third alterations and omission in original) (citation omitted) (internal quotation marks omitted).

The district court concluded that the evidence was insufficient to permit a rational factfinder to infer discriminatory intent. We agree.

### 1. The Evidentiary Standard

We pause to clarify the law on the categories of evidence that can be used to establish a mixed-motive claim. Burton agreed, when prompted by the district court, that she was "simply rely[ing] on the inference from the remark itself as direct evidence" of discrimination. The district court, in granting defendants' Rule 50(a) motion on the discrimination claims, noted that it was "accepting the plaintiff's theory that [her claim] rests on the direct evidence of the remark itself." This court, however, following the Supreme Court's command in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), has rejected the requirement that there be direct evidence in mixed-motive cases; any evidence, whether direct or circumstantial, may be amassed to show, by preponderance, discriminatory motive. See id. at 101-02; Hillstrom v. Best W. TLC Hotel, 354 F.3d 27, 30-31 (1st Cir. 2003); see also Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 17 (1st Cir. 2004).

### 2. Burton's Claim

Even under the more generous Desert Palace standard, Burton "must present enough evidence to permit a finding that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a

-19-

forbidden type of bias."  Hillstrom, 354 F.3d at 31; see also Desert Palace, 539 U.S. at 101 (holding that the plaintiff must "present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice") (internal quotation marks omitted).  Burton's evidence does not meet this standard.

Franco's derogatory remark came at the end of a testy phone conversation initiated by plaintiff.  Franco delivered the news to Burton that she was fired.  Burton protested and argued with the result.  Franco declined to get into the issue over the phone.  Importantly, the decision to terminate had already been made before the conversation took place.

Even if the repugnant remark was made, no evidence establishes a nexus between the termination of Burton's employment and any discrimination by the defendants.  Burton was discharged, correctly or not, because a student complained, and other students confirmed, that she had hit him.  There is no whiff in the record of a conspiracy to set up the plaintiff, nor would that theory be in the least bit credible on the facts here.  The evidence does not permit a finding of discriminatory motivation. After all, the same set of actors to whom Burton attributes discriminatory animus were favorably disposed enough toward her to have hired her less than

-20-

two weeks before her termination.  Dery and Franco both interviewed Burton, and Franco's approval was necessary for her hiring.

Based on the record before us, there is simply not enough evidence of pre-termination animus to establish that Burton's termination is attributable even in part to a forbidden bias.  We hold that the district court properly rejected the discrimination claims.

**IV.**

Judgment for defendants is **<u>affirmed</u>**.  Costs are awarded to defendants.