# United States Court of Appeals
## For the First Circuit

No. 05-1504

DANIEL J. GAGNON,

Plaintiff, Appellant,

v.

TELEDYNE PRINCETON, INC., ALLEGHENY TECHNOLOGIES, INC.,
PRINCETON DELIVERY SYSTEMS, INC. AND DOES 1-10,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Howard, Circuit Judge.

Wilbur A. Glahn, III, with whom R. David DePuy, Scott H. Harris, and McLane, Graf, Raulerson and Middleton, Professional Association, were on brief for appellant.
David G. Klaber with whom Mark D. Feczko, Jeffrey S. King, Gregory R. Youman, and Kirkpatrick & Lockhart Nicholson Graham LLP were on brief for appellees.

February 13, 2006

**COFFIN, <u>Senior Circuit Judge</u>.**   This is a product liability action, resting on diversity jurisdiction, brought in the district court for the District of Massachusetts.   Plaintiff-appellant was rendered a quadriplegic by injuries sustained when the forklift he was operating tipped over as he attempted to move a tree. Attributing the accident to a problem with the forklift, he sought recovery from defendants-appellees for alleged failures of design, lack of care in manufacturing, inadequate warning, breach of implied and express warranty, and misrepresentations in violation of the Massachusetts Unfair Trade Practices Act, Mass. Gen. Laws ch. 93A.   For reasons we shall explain, we vacate the district court's summary judgment for defendants and remand for further proceedings.

## I. <u>Procedural Background</u>

The accident happened in June 1999.   Suit was brought nearly three years later, in March 2002.   Defendants filed a motion to dismiss, and for a number of months the parties engaged in filing various oppositions and replies.   The court denied the motion to dismiss in January 2003 and set a schedule that required plaintiff to disclose his experts by January 30, 2004.   A joint motion for extension was granted in November 2003, and the new date for plaintiff's expert disclosures was April 30, 2004.   No further extension was sought until May 3, 2004, three days after the deadline.

-2-

At that time, plaintiff sought an additional six-week extension. The court denied this motion on May 21 based on Fed. R. Civ. P. 37(c)(1),[1] but plaintiff nonetheless proceeded to gather his experts' reports and filed his disclosure on June 14 – six weeks late. During the following nine months, four separate orders refusing reconsideration and precluding plaintiff's experts' putative testimony were issued. The court subsequently granted summary judgment for defendants, concluding that, without experts, the plaintiff could not establish his claims. It noted alternatively that the expert testimony would not have helped because the experts failed to address the critical issue of the forklift's condition at the time of its manufacture in 1988.

The termination of a case based on such a procedural requirement as timely disclosure of expert witnesses presents a particularly poignant issue when injuries are as serious as those suffered by plaintiff. We are nonetheless unable to say that the district court abused its discretion in impliedly finding that plaintiff failed to provide sufficient justification for his late disclosure. We are also unable at this juncture, however, to

---

[1] Rule 37(c)(1) states, in pertinent part: "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1)[listing required disclosures] . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions."

affirm the summary judgment because we lack the court's considered views as to whether the "harmless error" escape valve of section 37(c)(1) applies. We therefore remand for consideration of that issue. If the court on remand finds the tardiness to be harmless, its alternative ruling on the merits of the expert evidence must be revisited.

We proceed with the following steps: noting the issues presented and the relevant standard of review; tracing the tortuous path of this litigation, exposing the facts as the court reasonably could view them; and determining how law and policy apply to the facts at hand.

## II. Issues and Standard of Review

The issues before us involve the application of Fed. R. Civ. P. 37(c)(1), which excuses late disclosure if a party has "substantial justification." The first question we face, therefore, is whether plaintiff's rationale establishes justification for his untimeliness. But even if it does not, we must consider whether his delay was harmless.

Plaintiff asserts that his tardiness was caused by defendants' misrepresentations concerning stability testing on the forklift and by defendants' long delay in giving him the names of former employees who would have knowledge about that testing. This, he maintains, establishes "substantial justification." In addition, he emphasizes that his late disclosure caused no prejudice, as a

trial date had not yet been set and no pretrial deadlines were impacted.

Before delving deeply into the underlying circumstances, we must recognize that the expert preclusion order at issue here falls in the heartland of case management decisions – the area where a trial judge has the remorseless responsibility, evenhandedly and efficiently, to govern, monitor, and police the progress of an endless line of cases through the court. Our standard of review is abuse of discretion, which we have described as "highly deferential," Delaney v. Matesanz, 264 F.3d 7, 13-14 (1st Cir. 2001), requiring "strong evidence that the trial judge indulged a serious lapse in judgment," Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 875 (1st Cir. 1995). See also Macaulay v. Anas, 321 F.3d 45,51 (1st Cir. 2003) (in reviewing preclusion of expert testimony, court considers whether the ruling "was so wide of the mark as to constitute an abuse of discretion").

We narrow the field further when we focus specifically on Rule 37(c)(1). In Primus v. United States, 389 F.3d 231 (1st Cir. 2004), we stressed that "[t]he adoption of Rule 37(c)(1) in 1993 'gave teeth to a significantly broadened duty' to comply with case management orders." Id. at 234 (citation omitted). Our view of the effect of this rule is well stated in Klonoski v. Mahlab, 156 F.3d 255, 269 (1st Cir. 1998), where we declared that it "clearly contemplates stricter adherence to discovery requirements, and

harsher sanctions for breaches . . . , and the required sanction in the ordinary case is mandatory preclusion."

We review the facts, however, in the light most favorable to appellant, as this case comes before us on appeal of a grant of summary judgment. See Burton v. Town of Littleton, 426 F.3d 9, 14 (1st Cir. 2005).

### III. Factual Background

The initial inspection. In 2001, before the complaint was filed and approximately two years after the accident, two engineers were asked to review for design defects the "Piggyback" D-3600 forklift used by plaintiff. By late spring, the location of the forklift had been determined, a small farm about a two-hour drive east from Montreal, Canada. An affidavit of one of plaintiff's attorneys, Scott Harris, reports that the two engineers went to the farm and spent several hours examining the vehicle. Harris's affidavit presents their assessment as follows:

> Those two consultants concluded that the machine violated the standards for rough terrain forklifts adopted by the American National Standards Institute ("ANSI") and American Society of Mechanical Engineers ("ASME"). Consequently, we prepared Daniel Gagnon's case for filing.

In his brief, plaintiff asserts that the consultants "did not suggest testing the weight load capacity of the forklift," and he has maintained that that issue was not pursued early on because of defendants' representations that a metal plate on the machine attesting to its compliance with the ANSI/AMSE standards reflected

-6-

that testing had been conducted on it.  Plaintiff consequently looked elsewhere for a design flaw.

The complaint and answer.  The complaint was filed some nine months after the experts' report, in March 2002.  Its allegations, although presumably based on the experts' conclusions, are inconsistent in their treatment of stability and that of other alleged defects.  The complaint is very specific in alleging that the driver's cage is "too small and/or improperly angled" (¶22), that the moveable steering column exacerbated the operator's loss of control (¶24), that there was no brake (¶26), and that the seatbelt design was defective (¶28).  Then came the mention of instability, a generality surrounded by specifics.  The allegation of defective design in Count I (strict liability and implied warranty) concludes:

> Specifically, the protective cage, moveable steering column, lack of a foot pedal control for the brake, lack of a sufficient braking system, inherent instability of the machine, negligent design of the seat and seatbelt, lack of adequate rear weight, lack of a stationary steering wheel column, and other components of the Piggyback Forklift were designed in such a way as to pose an immediate, severe and unavoidable risk of danger to operators of the Piggyback Forklift. [¶42, emphasis supplied]

For more than a year after the complaint was filed, plaintiff seems to have taken no steps to make a case for an inherently unstable design.  Much time was devoted to filings related to defendants' motion to dismiss, which was denied on January 8, 2003.  Plaintiff asserts that, during this period, the two engineers had,

-7-

for reasons not associated with the case, lost plaintiff's confidence in their ability to be credible witnesses. After the January ruling, plaintiff began the search for new experts.

On January 31, defendants answered the complaint, asserting general denials of defective design and noting the absence of any information indicating how the forklift was "otherwise unsafe as well as improperly, dangerously, and defectively designed." The answer also contained many affirmative defenses, including the failure to establish proximate cause, plaintiff's own carelessness and failure to follow stated warnings and safe practices, and abnormal and unexpected use of the forklift.

Disclosure schedule; search for defendants' tests. With the deadline for plaintiff's disclosure of experts set for January 2004, plaintiff focused in the spring and early summer of 2003 on requests for production of documents and answers to interrogatories. These efforts resulted in defendants submitting a one-page "Compliance Matrix for ASME B56.6-1992." This document described the test to determine the longitudinal stability of a rough terrain forklift truck - mainly, to see if a fully loaded truck would still be stable when tilted on a 6% slope. Checkmarks indicated that this was mandatory, that there had been compliance, and that the person responsible for determining compliance was someone with the initials PWN. This proved to be one Paul Neagle,

the manufacturer's former chief engineer, who then became the object of plaintiff's search.

Before Neagle was located and deposed, the corporate designee of one of the defendants, Danny Denney, gave a deposition. He disclaimed any personal knowledge of "specific outside tests" that had been done on Piggyback forklifts and then explained the manufacturer's practice:

> [I]f the machine is labeled with an ANSI designation of B56.1 and/or .6 designation, in order to do that, that meant somebody had to go to the book that existed at the time, because those standards change throughout the years, and review that and ensure that the machine met those standards at that time. Somebody did that in order to put that [safety compliance label] on there. That's a voluntary standard. We don't have to meet those standards. There's no entity that says you have to. It's a voluntary restriction we put on our own design. So basically to do that, obviously somebody went through the review of what the standard is and ensured the forklift did it, performed within those standards.

Neagle's deposition was finally taken on February 17, 2004. His employment with the manufacturer (Teledyne Princeton) had commenced only in 1989, after the forklift at issue had been designed and manufactured. While he had done some "operational and performance testing" of the D-3600 model, he did not know of any "formalized testing." Although he thought that he had made some calculations as to the location of the center of gravity, he did not know of any prior testing of stability.

A three months extension and efforts to test. Only at the end of 2003, after Denney's deposition, did plaintiff decide to look

for the same model forklift to obtain "proof positive that the machine did not meet the represented standards."  <u>See</u> Harris Affidavit at 7.  In late March 2004 – with the expert disclosure deadline now set at April 30 – negotiations with the Canadian owner of the forklift resulted in plaintiff's purchase of the machine, which arrived in the United States on April 8.  Plaintiff had secured the services of three experts.  One was ready to give his opinion by mid-April.  A second expert, because of a fire at his residence overseas, had faced delay in receiving and responding to plaintiff's e-mail.  And the third, who had expected to do the required testing for longitudinal stability in the third week of April, had to wait until the testing could be done at a specially outfitted test center.  Time was running out.  Notwithstanding this, no attempt was made to notify the court and request a further extension.

<u>The late motion and rejection.</u>  Time had run out.  April 30 came and went.  By an e-mail message on April 28, plaintiff asked defendants to agree to a second extension, not a matter of days, but a six-week extension of time to disclose anticipated expert testimony.  Having accommodated defendants by extending a discovery deadline and agreeing to several additional depositions, plaintiff expected defendants to consent.  But late in the day on April 30 defense counsel reported that his clients refused.

Only on May 3 did plaintiff move the court for a six-week extension. Defendants opposed the motion, pointing out from information conveyed to them by the owner of the forklift that plaintiff's counsel and one or more of his experts had, years earlier, taken "possession of the actual forklift involved in the accident for an extended period and from all indications operated, inspected and tested the forklift, paying the then owner of the forklift for this opportunity." Defendants charged that there was no reason why, some time in the more than four years since the accident, plaintiff's experts could not have tested the lift.

The court denied the motion on May 21, citing its late filing and defendants' representations that we have just quoted. Notwithstanding this rebuff, plaintiff proceeded to submit, on June 14, a twenty-four page disclosure of witnesses. These included the three experts recently retained. Other named witnesses were a rehabilitation counselor, a physiatrist, an economic consultant, some sixteen institutional providers of medical care and many individuals associated with them, including treating physicians, a neurologist, a urologist, and specialists in nephrology.

The thrust of the experts' proffered testimony was that the Piggyback D-3600 forklift had been tested for longitudinal stability according to the ANSI standards and failed to handle the load for which it supposedly was certified. While the underlying causes of action in general terms covered this alleged defect, the

-11-

emphasis on the forklift's load-handling capacity marked a change in plaintiff's focus.

The filing of this ambitious disclosure was followed by a nine-month period of frenetic activity. Plaintiff had moved for reconsideration on June 1; the court denied the motion on July 6 after a flurry of filings in support and against it. On July 19, plaintiff again moved to allow a late disclosure of expert witnesses; this was denied on September 6, the court noting that "[z]ealous advocacy" had reached its limits on the issue.

Hearings: magistrate judge and the court. Defendants, meanwhile, had moved on July 8 to preclude expert testimony, and the motion was granted by a magistrate judge on September 29. In her order, she ruled that plaintiff's complaints of misconduct by defendants had not been borne out by the record, and that any such misconduct would not excuse the failure to timely disclose experts. Nevertheless, recognizing that precluding expert testimony might be fatal to plaintiff's claims, she allowed him opportunity to seek reconsideration before the district court.

On February 22, 2005, a hearing was held before the district judge, both to reconsider the magistrate judge's ruling and to consider defendants' motion for summary judgment. Despite having ruled on three occasions the previous year (May 21, July 6, and September 6, 2004), he was willing to reconsider in light of the fact that the magistrate judge had also reconsidered. What

-12-

bothered him, in addition to the untimeliness of disclosure, was that plaintiff's team had had access in 2001 to the very forklift involved in the accident, had examined it, knew where it had been ever since, and yet had done no testing until 2004.

In response, plaintiff's counsel explained that, despite the reactions of the first two experts, no defect justifying such testing had been suspected. Plaintiff's counsel listed the thinking that existed when the lawsuit was brought:

> We thought [the machine] was unstable, and we thought the cage was too small, or the head bar was too small, and that the machine was unstable because of certain other defects, the – the steering wheel that you push forward to make it go forward, and you pull it back to make it go back.

But because defendants' representations indicated compliance with ANSI standards, these details missed what counsel acknowledged had now become "the core of this case." This significant colloquy between court and counsel followed:

> THE COURT: Shouldn't you have tested this? I mean, after all, when you have a claim that the – this vehicle tipped over, doesn't it occur to you that it might have tipped over, because it couldn't have carried the load going backwards?
>
> Doesn't that – doesn't that seem one of the first thing [sic] you look – you'd look to?
>
> COUNSEL: Yes.
>
> * * *
>
> THE COURT: And you accepted that they had tested. You asked about that, and you accepted that they had tested it and that they could not find the testing before you tested this vehicle.

-13-

COUNSEL: Yes, your Honor.

THE COURT: And you did not test it – you did not test it for three years after you looked at this machine –

COUNSEL: Yes, your Honor.

THE COURT: . . . It strikes me that, you know, that I should exclude this, these experts, because in that period of time all of these tests could have been – could have taken place.

COUNSEL: But we were – in retrospect, what you're saying is right, I should have acted quickly, or responded, or what have you. I did not. The cost of the test was significant. We had a steel box constructed in Illinois. We had a connection there. We had the forklift shipped out to Illinois, and we had two engineers test it, and we purchased the machine – I think the cost all total was around $30,000.

On March 1, the court granted defendants' motion to strike the expert evidence from plaintiff's opposition to defendants' motion for summary judgment, again deeming the proffer unjustifiably late. The next day, the court granted summary judgment to defendants since, "[w]ithout experts, the plaintiff cannot establish his claim of negligence or breach of warranty . . . ." The order went on to note that, even if the testimony of the late-disclosed experts were allowed, plaintiff could not prove his claims.

## IV. Analysis

Substantial Justification. This case differs somewhat from others that have come before us. We have neither a series of missed deadlines nor a last minute disclosure on the eve of trial. Instead, we have one missed deadline, preceded by lengthy and

-14-

persistent discovery that in the end proved a blind alley to discovering the basic issue in the case. A request for extension was filed three days after the deadline, before the scheduled close of discovery or the setting of a trial date.

The parties, of course, differ completely on the justification for what happened. Plaintiff claims that he reasonably relied on defendants' representations that the forklift complied with the ANSI standards and that he was misled until he was able to buy the vehicle and transport it to the United States for testing in 2004. Defendants claim that plaintiff not only had ample opportunity to test the forklift since 2001, but that his single-minded attempt to build his case on testing information from defendants was "vexatious behavior" mandating refusal of the proffered expert testimonies.

As noted earlier, we review this case through a lens "highly deferential" to the court. It is obvious that the court was not impressed by plaintiff's arguments. It repeatedly expressed its difficulty in understanding why plaintiff would confine his efforts to probing defendants' knowledge and information about tests. It also was unpleasantly surprised to learn that plaintiff knew the location of, and had access to, the very forklift involved in the accident for some three years. It saw no reason why he had not made his own independent investigation of stability. Is this a

-15-

view so "wide of the mark" that it is an abuse of discretion?  A number of indications in the record support the court's conclusion.

To begin, plaintiff's first experts concluded in 1999 that the machine violated the ANSI/AMSE standards.  Although those individuals were later discharged, we have no explanation why their initial conclusion was not further pursued.  Plaintiff argues that we should not fault his inaction in pursuing the instability theme because of the pendency of a motion to dismiss filed by defendants. We fail to see why a party may not continue the investigation of a case even while responding to motions filed by his adversary.

Plaintiff's main justification, of course, was that he relied on defendants' representations that tests had been conducted that led them to label the forklift with a plaque indicating compliance with the stability standards.  Plaintiff had received a copy of a report by an independent testing facility, certifying that the forklift had passed the ASME/ANSI standards relating to a "crush test," which evaluated the protectiveness of the driver's cage. He knew, however, that defendants did not have an independent report on longitudinal stability and admits that he accepted their assurance of compliance "at face value, albeit with some degree of inquisitiveness."

That degree of inquisitiveness clearly did not satisfy the district court.  By September 2003, plaintiff knew that defendants could not locate their tests supporting compliance.  Although

-16-

plaintiff persisted in a search for the tests, the district court reasonably could conclude that placing implicit trust in the integrity of tests conducted by an adversary, instead of endeavoring to do original testing, resulted in delay for which plaintiff was responsible. The court may be forgiven for thinking that plaintiff could have done, at any time since 2001, what he did in the spring of 2004. Plaintiff's explanation to the court that costs of purchasing, shipping, and testing were "significant" does not insulate him from "the consequences of the risk [he] assumed." See LaPlace-Bayard v. Batlle, 295 F.3d 157, 162 (1st Cir. 2002).

While laws, rules of pleading and procedure, practices, and ethical principles have considerably cabined and refined the "sporting theory of justice," a continuing responsibility rests on parties to investigate their causes of action. Too facile an acceptance of representations from adversaries is dangerous. Whether plaintiff was reasonable in relying on the litigation strategy he adopted is not our question. It is whether the district court abused the discretion accorded to it. We hold that it did not.

What we have said concerns a party's obligation to investigate. We now come to the obligation to observe deadlines set by the court. As we have noted, the parties jointly moved for a three-month extension of time in which to disclose experts. The court accommodated by advancing the date to April 30, 2004, giving

-17-

plaintiff five additional months. We have detailed the difficulties plaintiff encountered, both with his new experts and with making arrangements for testing the forklift. We have also related how time ran out without any attempt to obtain a second extension of time.

At oral argument we sought the reason.

COURT: There was a lot of investigation done by your side of the case but there's a disconnect for me in terms of missing the deadline. Exactly what was the justification for that?

COUNSEL: Your honor, in many respects it was an error on our part. We talked to the other side about a concurrence. But there is a simple reason for why we waited until when we waited. And the answer is we thought we could do it. We thought in February that we could get these tests done. And it wasn't until the middle of April that we realized that we couldn't. If we knew what we knew now, clearly you could say what we should have done is go into Judge Lindsay's courtroom in February and say we've got a problem, your honor. But that would have immediately then have said: No. 1, we're certain that when we get this test it will fail and we weren't certain of that, and secondly, we would have been in a position where we were asking for an extension early on.

COURT: When did you realize that you couldn't make it?

COUNSEL: In mid April your honor.

COURT: And when was the deadline?

COUNSEL: The deadline was April 30th.

COURT: Well, why didn't you then say, Judge, we've got a problem.

COUNSEL: We should have. We should have.

-18-

This has not been a tale of lack of effort, of bland disobedience of a series of court orders, or of unsavory scheming, but of what the district court could reasonably view as a miscalculated strategy topped by an inexcusable failure to observe a long-established deadline. We add that both the magistrate judge and the court gave consideration and sensitive reconsideration to plaintiff's attempted justification for late disclosure. The court did not commit an abuse of discretion in impliedly ruling, as a basis for its preclusion of expert witnesses, that the failure to disclose was not substantially justified.

Harmlessness. We therefore turn to the smaller escape valve in Rule 37(c)(1): whether the late disclosure, though not justified, was nonetheless harmless. The contours of this provision are not well charted.

The Advisory Committee notes to the 1993 amendments to the rule state that the harmlessness provision is intended "to avoid unduly harsh penalties in a variety of situations." Illustrative examples are late disclosures of a potential witness known to all parties, a trial witness already listed by the adverse party, or a witness on behalf of a pro se litigant ignorant of the requirement. These suggest a fairly limited concept of "harmless." Certainly, were the concept to be a balancing of harms or burdens of the parties, without consideration of fault or concerns about present and future court administration, an individual plaintiff in a

-19-

product liability case would likely always prevail against a corporate defendant, no matter how poor his counsel's representation or how case management might be affected. The latter would be seriously compromised.

As we stated in Macaulay, 321 F.3d at 51, "[T]rial judges must work a complicated equation, balancing fairness to the parties with the need to manage crowded dockets." This means that

> the court of appeals must consider a multiplicity of pertinent factors, including the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's ability to overcome its adverse effects. Surprise and prejudice are important integers in this calculation. So too is an assessment of what the late disclosure portends for the court's docket.

Id. (internal citations omitted).

Plaintiff argues that his late disclosure was made before any trial date had been set and did not involve serious or repeated misconduct. The only prejudice faced by defendants, he asserts, is the need to support the representations about stability that they have made for two decades and could address by repeating the testing that allegedly had been done. Defendants point out that their response to plaintiff's appeal is at least the sixth time they have invested effort to oppose plaintiff's motion for a six-week extension, and prejudice also exists in their having prepared a dispositive motion for summary judgment predicated on the preclusion of the expert testimony.

Our problem with the record before us is that, restricted though the concept of harmlessness might be, there was not only no balancing of fairness, burden, and case management needs, but also no evident consideration of the issue. The magistrate judge noted the plaintiff's contention that the late disclosure would have "only 'slight impact' on the Court's administration of the case," but disposed of the argument, stating:

> That decision is not one for the plaintiff's counsel to make; it is one for the District Court. It appears to this Court that the District Court has spoken clearly and authoritatively on such matters in this case, and it is not for this Court to second-guess such decisions.

The district court, however, made no findings on the issue and engaged in no discussion of it. Consequently, the record is not developed enough for us to make a valid judgment on review. Because lack of prejudice is a specific caveat in Rule 37(c)(1), and preclusion is the death knell of plaintiff's case, we think the issue sufficiently important to warrant the district court's explicit consideration.

This is not to say that findings are always required. In many instances, the court's deliberation is apparent or "findings may be easily inferred from the record," Robson v. Hallenbeck, 81 F.3d 1, 5 (1st Cir. 1996) (referring to rulings on a party's misconduct and excuses); see also Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999) (harmless error). In David v. Caterpillar, Inc., 324 F.3d 851, 857-58 (7th Cir. 2003),

the court noted the trial judge's consideration of prejudice, concluding, "Given the district court's thoughtful discussion of this issue, we cannot say" it abused its discretion. And in Primus, we noted, "Although 'preclusion of expert testimony is a grave step, not to be undertaken lightly,' the court here acted with due deliberation" in offsetting the exclusion by allowing supplementation of a disclosed expert's testimony. See 389 F.3d at 234-35 (internal citation omitted).

An expectation of focused consideration of harmlessness is implicit, we feel, in Robson's acknowledgment, citing Velazquez-Rivera v. Sea-Land Service, Inc., 920 F.2d 1072, 1077-78 (1st Cir. 1990), that dismissal for a minor act of negligence in the absence of prior warning or a showing of special prejudice would be too harsh, but that a "pattern of unexcused noncompliance" or a "succession of violations" would in itself justify dismissal. See Robson, 81 F.3d at 3-4. In the absence of such circumstances, some attention should be given to the issue of possible prejudice. Here, however, we have no report of any such deliberation.

We therefore deem the need for remand evident. We do not wish to restrict the court in its inquiry, which may or may not, in its judgment, require hearing, argument, or evidence. Possible inquiries include addressing the history of plaintiff's strategy, and assessing whether it deems such action sufficiently blameworthy to warrant dismissal without consideration of harmlessness;

assaying the burden and expense that defendants have faced and would likely face in dealing with the issue presented by the belated June 14 disclosure; and looking closely at the impact of any decision on concerns of court management for the present and future caseload.  The court also may wish to consider whether a less severe sanction would be effective.

## V. <u>Materiality of the Expert Testimony</u>

Because we deem the court's primary holding insufficient, at this juncture, to support summary judgment, we must consider the effect of its alternative conclusion that, even with the proffered expert testimony, plaintiff's case is flawed.  Noting that the experts addressed only the condition of the forklift at the time it was tested in 2004, the court observed that this evidence would not assist plaintiff in proving that the machine was defective at the time of manufacture or when the accident occurred.

Defendants argue that plaintiff is foreclosed from arguing the merits of the expert testimony because the issue was not raised below.  Plaintiff counters that the court addressed the issue sua sponte, preventing him from fully responding to perceived deficiencies in the experts' affidavits.  Defendant responds that the court's questioning at the summary judgment hearing plainly put plaintiff on notice that the materiality of the expert opinions was of concern, and they further argue that plaintiff had multiple opportunities to object to the court's having addressed the issue.

We decline to referee this debate. The district court likely gave short shrift to its alternative ruling because its Rule 37(c)(1) holding was dispositive. Given that defendants moved for summary judgment based solely on the exclusion of expert testimony, we think the court would have provided plaintiff additional opportunity to support his position on the merits had it not already determined the case should be dismissed. On remand, the court may again reach the same outcome on the first issue, finding that plaintiff's late disclosure was not harmless and that the case accordingly must be dismissed. Further discussion of the content of the offered testimony would then be unnecessary. If, however, the district court chooses to allow the expert testimony based on lack of prejudice, we think the interests of justice are best served if it reconsiders as well the cogency of that testimony. We therefore conclude that the grant of summary judgment for defendants must be vacated.

The judgment below is VACATED and the case is REMANDED for further proceedings in accordance with this opinion. The parties shall bear their own costs.